292 F.2d 182
 Bennet F. SCHAUFFLER, Regional Director of the Fourth Region
of the National Labor Relations Board, for and on
Behalf of the NATIONAL LABOR RELATIONS BOARD,
v.
LOCAL 1291, INTERNATIONAL LONG-SHOREMENT'S ASSOCIATION, Appellant.
 Nos. 13457, 13461.
 United States Court of Appeals Third Circuit.
 Argued Jan. 27, 1961.
Decided June 20, 1961.
 
 Abraham E. Freedman, Philadelphia, Pa. (Marvin I. Barish, Freedman, Landy & Lorry, Philadelphia, Pa., on the brief), for appellant.
 Winthrop A. Johns, Washington, D.C. (Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Clifford M. Roth, Attorney, National Labor Relations Board, Washington, D.C., on the brief), for appellee.
 Before BIGGS, Chief Judge, and McLAUGHLIN and KALODNER, Circuit judges.
 BIGGS, Chief Judge.
 
 
 1
 On August 18, 1960, the coury below granted the petition of the Regional Director of the National Labor Relations Board brought pursuant to Section 10(l) of the National Labor Relations Act, 29 U.S.C.A. 160(l) for a temporary injunction against the appellant, Local 1291, International Longshoremen's Association, pending final disposition by the Board of an alleged jurisdictional dispute. On November 30, 1960, on the petition of the Regional Director, Local 1291 was found guilty of civil contempt of court for failing to comply with the injunction. These are consolidated appeals from the two judgments of the court below.
 
 
 2
 Three questions are presented for our determination: First, whether the court below was clearly erroneous in holding that the Board had reasonable cause to believe that Local 1291 was engaged in an unfair labor practice within the purview of Section 8(b)(4)(D) of the N.L.R.A., 29 U.S.C.A. 158(b)(4)(D); second, whether the court below construed its injunction too broadly in adjudging Local 1291 in contempt of court; and third, whether the court's determination that Local 1291 engaged in conduct proscribed by the injunction, was supported by clear and convincing evidence.
 
 
 3
 The unfair labor practice charge was brought by the Northern Metal Company. In determining that it had reasonable cause to believe that Local 1291 was engaged in an unfair labor practice the Board relied principally on statements made by the president and the marine manager of Northern. The court below, in finding for the Board, based its conclusions on the testimony of these two persons. Their version of the facts was as follows.
 
 
 4
 Northern Metal Company operates a dockside terminal and warehouse in the Port of Philadelphia where it loads and unloads cargo shipped to and from foreign ports. Since 1946 Local 14, Industrial Union of Marine and Shipbuilding Workers of America has been the certified bargaining representative of Northern's maintenance and production employees. By the terms of its contract with the Company, Local 14 has jurisdiction over all work done in Northern's 'yard' which is an area extending over 162 acres adjacent to docks fronting on the Delaware River. In 1951 the United States offered Northern a contract to load motor vehicles, consigned for the armed services, aboard ship for transport overseas. At that time Northern's president called a meeting which was attended by representatives of Local 14 and of the appellant, Local 1291. The labor leaders were told of the proposed contract and the parties discussed the division of the work between the two unions. It was agreed by all parties that the employees represented by Local 14 would perform the work of moving motor vehicles to and from the point on the pier at or near shipside where the hook on the winch or crane falls to pick up or unload cargo. Local 1291 was assigned all of the work beyond the 'hook'. In other words, Local 14 was to move the vehicles through the 'yard' to and from shipside while Local 1291 was to perform the hooking work, the hoisting and the stowing aboard ship. Shortly thereafter, at another meeting, Local 1291 agreed to perform the work assigned to them in gangs of 15 men.
 
 
 5
 These arrangements lasted 9 years. During that period Northern loaded and unloaded more than 250,000 vehicles, at least 10,000 of which were automobiles privately owned by members of the Armed Services. In April, 1960 Northern's president had a meeting with representatives of Local 1291 at which a possible new government contract was discussed. The union was told that Northern would handle 30,000 to 60,000 privately owned automobiles per year under the proposed contract. There was no mention at this meeting of any need to use gangs of more than 15 men in the performance of the contemplated work. Northern subsequently signed the contract and the first 2 shiploads of privately owned automobiles were loaded by members of Local 1291 working in 15-man gangs. On June 12, 1960 representatives of Local 1291 and of a 'checkers' Local of the ILA visited Northern's president, and told him '* * * if you let us do all the work in here we are going to have all that work and you will be making money.' These overtures were rejected on the ground that Northern could not comply without breaking its contract with Local 14. One week later, on June 19, a delegate of Local 1291 telephoned Northern and demanded that Northern shape 22-man gangs to load automobiles on a third ship. Northern's president protested to another delegate of Local 1291, pointing out that Northern did not need men to take the vehicles to a place of rest near shipside since that work was done by Local 14, and that therefore Northern needed only 15 longshoremen. The delegate replied that when Northern shaped 22-man gangs Local 1291 would do the work that Local 14 was currently performing. Northern then got in touch with the president of Local 1291 who said, '* * * there is only one thing you can do, shape your 22-man gangs and take it to arbitration, to the Philadelphia Marine Trade Association (PMTA) on Monday.'
 
 
 6
 Northern had entered into a contract with Local 1291 in 1951. The contract was negotiated for Northern by the PMTA which is the bargaining agent for various marine firms with respect to contracts with the various ILA Locals. By the terms of the contract disputes between an employer and his employees are submitted to a grievance committee consisting of a union representative, a management representative, and an impartial umpire selected by the two representatives. On June 21, pursuant to the suggestion of Local 1291's president, Northern brought the issue of the gang sizes before a grievance committee.[1] The issue before the committee was whether privately owned automobiles were 'heavy lifts' or 'general cargo' within the meaning of the contract since only 15-man gangs are required by the contract for 'heavy lifts' while 22-man gangs were required for the handling of 'general cargo'.[2]
 
 
 7
 After a hearing[3] the grievance committee apparently rendered an oral decision. Subsequently, the 'ruling' of the committee, contained in a letter dated June 22, was sent to Northern and Local 1291. This letter, in pertinent part, reads as follows: 'P.M.T.A. recognizes that there is a problem peculiar to Northern Metal Company as opposed to any other place in the Port of Philadelphia area because the jurisdiction of two different unions are involved. However, P.M.T.A. representatives agree with union representatives on the Grievance Committee that the practice in the port in the handling of automobiles is that a gang of twenty-two men and a foreman are to be employed. If this decision results in jurisdictional problems between I.L.A. and the men from the other union who had jurisdiction over a certain portion of the work, P.M.T.A. is not empowered to resolve any such jurisdictional dispute and the dispute will have to be handled by the employer's attorney in the same manner as any other jurisdictional problems would be handled.' The interpretation and legal effect of this decision are matters of sharp dispute between the parties.
 
 
 8
 From June 19, 1960 until the time the court below issued its injunction Northern shaped 22-man gangs to load the privately owned automobiles. According to Northern the additional 7 men which it has been forced to hire perform no work on the job. Northern contends that 7 extra longshoremen would be required only if Local 1291 had jurisdiction over the 'yard' work performed by Local 14. In short Northern's position was that 22-man gangs were only needed when 7 of that group were required to move cargo to and from the 'hook'. At Northern's piers, since this work was done by Local 14, only 15 and not 22-man gangs were needed. Thus, Local 1291's demand that 7 extra men be hired was unreasonable, and its refusal to work unless 22-man gangs were shaped was a lever by which it hoped to oust Local 14 from work over which it rightfully had jurisdiction.
 
 
 9
 Local 1291's principal witness in the court below was its president. He categorically denied that any jurisdictional dispute existed between Local 1291 and Local 14. He further denied that his union demanded the assignment of 'yard' work from Northern. He asserted the sole basis of the dispute between Northern and Local 1291 was the number of men required for the loading or unloading of passenger vehicles. He pointed out that the applicable collective bargaining agreement required Northern to shape 22-man gangs to handle 'general cargo' and that the grievance committee had held that the contract required that privately owned automobiles be handled by 22-man gangs. In substance, Local 1291's position was and is that the sole issue involved in this dispute is whether 22-man gangs are required by the terms of the PMTA-ILA contract, and that this question was finally determined by the decision of the grievance committee on June 21, 1960. Local 1291 argues that it cannot be found to have engaged in an unfair labor practice merely because it demanded rights guaranteed it under a collective bargaining agreement.
 
 
 10
 The court below filed findings of fact,[4] conclusions of law and a lengthy opinion. 188 F.Supp. 203, 208. The court summarized the facts as it had found them to be as follows: 'Since on or about June 19, 1960, respondent (Local 1291) has demanded that Northern assign the work of moving motor vehicles to and from the point where they are taken over by, or released from 'the hook,' to employees who are members of or represented by respondent, which work Northern has assigned to its employees who are members of Local 14 as above stated. In furtherance of its said demand, and on or about June 19, 1960 respondent first refused to furnish stevedores to Northern both for the loading and unloading of motor vehicles and for the loading and unloading of general cargo, and ordered, instructed, directed and appealed to its members and persons represented by it not to work for Nothern unless or until Northern assigned to employees who are members of, or represented by, respondent the work of moving vehicles to and from the point where such vehicles are taken over by, or released from, 'the hook.' Northern protested in vain and acquiesced under duress. The loading of vehicles thereafter under protest continued with respondent supplying gangs of 22 instead of 15 men as theretofore.' The court then concluded that the Board clearly had reasonable cause to believe that Local 1291 was engaged in an unfair labor practice within the purview of Section 8(b)(4)(D).[5]
 
 
 11
 Pursuant to Section 10(l) of the N.L.R.A., on August 18, 1960, the court enjoined Local 1291 from engaging in any activity which had as its object the coercing of Northern to assign the work of moving motor vehicles to and from the point where such vehicles are taken over or released from the 'hook' to employees who are members of Local 1291 rather than to those employees represented by Local 14.[6] The court did not, either in its separate findings of fact or by its conclusions of law or its opinion, discuss the effect of the PMTA-ILA collective bargaining agreement on its decision that the Board had reasonable cause to believe that Local 1291 had engaged in an unfair labor practice. Nor did the court explicitly enjoin Local 1291's refusal to supply gangs of less than 22 men.
 
 
 12
 In Schauffler v. Highway Truck Drivers and Helpers, 3 Cir., 1956,230 F.2d 7, 9, this court determined that the scope of its review of Section 10(l) proceedings is limited to a determination whether the district court's finding that there is reasonable cause to believe that a violation of the Act as charged has been committed is clearly erroneous.[7] In applying this standard it must be borne in mind that a Section 10(l) injunction is interlocutory in nature and only remains in force pending the final adjudication of the Board with respect to the unfair labor practice charge. The Section 10(l) procedure reflects the congressional determination that certain unfair labor practices are so disruptive that where there is reasonable cause to believe that they are being engaged in their continuance during the pendency of charges before the Board should not be permitted, S.Rep. No. 105, 80th Cong., 1st Sess., pp. 8, 27. The Board need not show that an unfair labor practice has been committed, but need only demonstrate that there is reasonable cause to believe that the elements of an unfair labor practice are present. Nor need the Board concludsively show the validity of the propositions of law underlying its charge; it is required to demonstrate merely that the propositions of law which it has applied to the charge are substantial and not frivolous. Retail, Wholesale & Dept. Store Union v. Rains, 5 Cir., 1959, 266 F.2d 503, 505-506; Douds v. Milk Drivers & Dairy Employees Union, 2 Cir., 1957, 248 F.2d 534, 538; Dooley v. Highway Truck Drivers, D.C.Del.1960, 182 F.Supp. 297, 301. The final adjudication of the Board of both questions of fact and law is, of course, ultimately reviewable by this court pursuant to Section 10(e) and Section 10(f) of the N.L.R.A.
 
 
 13
 It is clear that the finding of the court below of reasonable cause to believe that Local 1291 demanded that Northern assign it work rather than to employees represented by Local 14 is supported by substantial evidence. Northern's president testified that such was the fact. A demand for work assigned to another union is, however, not in itself an unfair labor practice within the meaning of Section 8(b)(4)(D). A demand of this nature in order to constitute an unfair labor practice must be shown to be implemented by a strike, a refusal to perform services, a threat, or restraint of some kind. It is this element that presents the difficulty in this case, for the only acts on the part of Local 1291 charged by Northern to be an implementation of its demand for Local 14's work are its refusals to supply gangs of less than 22 men. Local 1291 insists that this refusal is, aside from any jurisdictional problem, strictly in accordance with its rights under its contract with Northern as that contract has been authoritatively construed in arbitration to which both Local 1291 and Northern submitted. Thus, Local 1291 poses the question whether, as a matter of law, on this state of facts, there can be an unfair labor practice, and whether in a situation such as this a district court's determination of the existence of reasonable cause to believe that all of the elements of an unfair labor practice are present must be reversed as clearly erroneous.
 
 
 14
 As we have pointed out previously, however, the Board and Northern dispute Local 1291's interpretation of the grievance committee's decision. They argue that the committee did not decide that Local 1291's demand for 22-man gangs was within its rights under the contract, but rather that the committee refused to decide the matter because it recognized that a jurisdictional dispute might be involved. Moreover, Northern's president gave some testimony to the effect that the committee rendered its decision without affording Northern a fair hearing. In addition, the Board contends that the decision of the committee is not decisive because Local 14 was not a party to the grievance proceedings. Finally, the Board implies that Local 1291 might be held to have abandoned whatever rights it might have had with respect to the shaping of 22-men gangs. We add that the effect of colective bargaining agreements on proceedings by the Board in itself may raise questions difficult, if not impossible, to answer on the present record.
 
 
 15
 It is apparent that many questions of fact and of law would have had to have been resolved by court below before it could have determined the precise effect of the PMTA-ILA contract and the June 21, 1960 grievance proceeding on the present controversy. At least some of these questions must be recognized to be other than frivolous in nature. If, in a Section 10(l) proceeding, a district court or a court of appeals undertook to finally adjudicate such questions it would not be acting consistently with the congressional policy underlying Section 10(l). That Section's usefulness as a tool with which the status quo may be preserved pending final adjudication would be diminished insofar as the Board would be required to finally litigate questions of substance at a preliminary stage. Moreover, the court would not have the benefit of the Board's opinion on questions of fact and novel questions of labor law when making its decision. Thus, the court would, to some extent, usurp the Board's function as the primary fact finder in cases arising under the Act and its function as primary interpreter of the statutory scheme. We are of the opinion, therefore, that the issue of the effect of the contract as interpreted by the grievance committee was properly left to the Board by the court below and that the existence of this issue cannot be held by this court to render the district court's finding of reasonable cause clearly erroneous. See Retail, Wholesale & Dept. Store Union v. Rains, 5 Cir., 1959,266 F.2d 503; Douds v. International Longshoremen's Ass'n, 2 Cir., 1957,242 F.2d 808, 810-811; Douds v. Milk Drivers & Dairy Employees Union, 2 Cir., 1957, 248 F.2d 534.
 
 
 16
 On October 31, 1960 the Board petitioned the court below to adjudge Local 1291 in civil contempt of court for failing to comply with the injunction of August 18, 1960. An order to show cause was issued on the same date and a hearing was held on November 17, 1960. At the hearing the Board produced the superintendent of stevedores for Northern as its only witness. He testified to the effect that on a few occasions he was told by a foreman whom he sent to shape up gangs of 15 men that the men refused to load privately owned automobiles with other than 22-man gangs. There was no testimony to the effect that Local 1291 had directed the action of the men, nor was there any evidence that Local 1291 coupled its refusal to work with a demand for Local 14's work. On November 30, 1960, the court below entered its judgment of civil contempt. 189 F.Supp. 737.
 
 
 17
 Local 1291 first attacks the court's adjudication of contempt on the ground that the injunction did not proscribe a refusal to work conditioned upon the shaping by Northern of 22-man gangs. It is true, as we have pointed out, that the court's injunction did not expressly refer to gang sizes or demands by Local 1291 for 22-man gangs. Local 1291 was enjoined from ordering, inducing, or in any way persuading its members to refuse to work or any other course of conduct where an object of the conduct was to force Northern to assign to Local 1291 work that was allegedly within the jurisdiction of Local 14. In this respect the injunction was specific. We believe that it was or should have been crystal clear to Local 1291 that the enjoined conduct included inducing refusals to work conditioned on the shaping of 22-man gangs. This was stated explicitly in the court's opinion where it indicated that the coercive activity engaged in by Local 1291 was a refusal to work with less than 22 men. See 188 F.Supp. at 208. Moreover, the sole type of conduct with which Local 1291 was charged in the injunction proceedings was a refusal to supply 15-man gangs. Indeed, all of the testimony and argument by both sides at that proceeding centered around that single type of allegedly coercive conduct engaged in by Local 1291. It is inconceivable that the injunction, admittedly framed framed in general terms, could have been interpreted by Local 1291 as not relating to their refusal to work in 15-man gangs. But even without these interpretive aids the language of the injunction is sufficient. Thus, while it is true that no person should be held in contempt for violating an order which leaves doubt and uncertainty in the minds of those to whom it is addressed, it would be wholly unreasonable in this case to hold that Local 1291 was not clearly forewarned that a demand for 22-man gangs would constitute a violation of the court's injunction.
 
 
 18
 Local 1291 renews its contention on this issue that it cannot be enjoined from demanding rights secured to it under its collective bargaining agreement and that, therefore, the injunction cannot be read as prohibiting its refusal to work in other than 22-man gangs. As we have indicated above it may be true that the PMTA-ILA contract gives Local 1291 the rights that they assert under it. As we have also pointed out, however, the Board has raised questions in this regard which may not be determined in this interlocutory proceeding. It may further be true that Local 1291 is not engaged in an unfair labor practice, but that determination will have to be made in subsequent proceedings. This court will not review the Board's finding of reasonable cause as if upon a final adjudication. After there is a final adjudication and the case comes before us, we will, of course, consider all of the questions raised by the parties in depth and pass upon the merits of this controversy.
 
 
 19
 Local 1291 next challenges the sufficiency of the evidence produced at the hearing by the Board to show that the union violated the court's order. It is well settled that the petitioner in a civil contempt proceeding must prove a violation of the court's order by more than a mere preponderance of the evidence. Some courts have indicated that the petitioner must produce 'clear and convincing evidence'. Other courts have held that the violation must be shown by 'a clear preponderance of the evidence'. Some of these courts and still others have indicated that 'a degree of certainty if required which leaves no fair ground of doubt' as to the violation of the court's order. Whatever the precise language used it must be taken as settled that the petitioner in a civil contempt proceeding must overcome a heavy burden of proof. See the summary of the law in Kansas City Power & Light Co. v. N.L.R.B., 8 Cir., 1943, 137 F.2d 77, 79. The standard approved by this court in Fox v. Capital Co., 3 Cir., 1938, 96 F.2d 684, 686 is controlling here. In that case we said that, 'The plaintiff has a heavy burden to show a defendant guilty of civil contempt. It must be done by 'clear and convincing evidence,' and where there is ground to doubt the wrongfulness of the conduct of the defendant, he should not be adjudged in contempt.' We think that the court below erred in failing properly to apply this test.
 
 
 20
 It is our opinion that the Board's evidence was not 'clear and convincing.' Much of the testimony given by Northern's superintendent, also a member of Local 1291, was hearsay. Moreover, he related only a few instances[8] in which longshoremen refused to work in 15-man gangs. These sporadic refusals were not enough, under the circumstances, to show or to support the inference that Local 1291 was responsible for these actions of the longshoremen. See Pennsylvania Greyhound Lines, Inc. v. Amalgamated Ass'n, D.C.W.D.Pa. 1953, 14 F.R.D. 11. Furthermore, it is not clear that the cargo that was to be loaded at the times described was other than 'general cargo' as Northern itself defines that term. Finally, the testimony was vague, incoherent and generally not of the type to dispel fair grounds of doubt that the court's order was violated. We note that Local 1291 offered no testimony on its own behalf on this issue but merely demurred to the evidence offered by the Board. We hold, nonetheless, that the Board has failed to sustain the required burden of proof to demonstrate that Local 1291 was guilty of civil contempt.
 
 
 21
 The judgment of August 18, 1960, at our No. 13,457 will be affirmed. The judgment of civil contempt of November 30, 1960, at our No. 13,461 will be reversed.
 
 
 
 [1]
 The committee consisted of 2 union representatives and 2 PMTA representatives. No impartial arbitrator was appointed. The parties do not, however, rise the question whether the panel was duly constituted despite the fact that its membership was not constituted precisely as prescribed in the contract
 
 
 [2]
 Paragraph 14 of the PMTA-ILA Collective Bargaining Agreement reads as follows: 'Minimum number of men in gang when discharging or loading general cargo to or from the pier shall be twenty-two (22) men, including drivers of mechanical equipment, not less than eight (8) hold men discharging and eight (8) hold men loading. This clause is not to apply to handling cork, burlap, newsprint and logs where hooks are used, heavy lifts, sugar at sugar refineries or warehouses, lumber, rubber, tinplate and sheet steel in packages or to work at Ford's Plant in Chester, Pa. or to similar conditions that may be agreed by the committees. This clause is not to apply to handling cargo to or from open top cars or open lighters.'
 
 
 [3]
 Northern representatives testified that they were not given a fair opportunity to present their views at this hearing. The union and the Executive Secretary of the PMTA testified to the contrary
 
 
 [4]
 The court was not required to make findings as to the truth or falisity of the facts alleged in the Director's petition. It was only necessary to determine whether the Director had reasonable cause to believe that the charges filed were true. The court must, of course, also find, as it did find, that its granting of equitable relief was 'just and proper'. We will treat the court's fact finding as a determination of those facts which the Director had reasonable cause to believe, and we point out that these findings should not be deemed conclusive on the parties in any subsequent proceedings
 
 
 [5]
 Section 8(b)(4)(D) provides that:
 '8(b) it shall be an unfair labor practice for a labor organization or its agents--
 '(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (i ) to threaten, coerce or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is:
 '(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work.'
 
 
 [6]
 The injunction in pertinent part was as follows: Local 1291 is hereby enjoined from: 'In any manner or by any means, including picketing, orders, directions, instructions, requests, or appeals, however given, made or imparted, or by any like or related acts or conduct, or by permitting any such to remain in existence or effect, engaging in, or inducing or encouraging any individual employed by Northern Metal Company, or by any other person engaged in commerce, to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any service, or in any manner or by any means, threatening, coercing, or restraining Northern Metal Company, or any other person engaged in commerce or in any industry affecting commerce, where in either case an object thereof is to force or require Northern Metal Company to assign to work of moving motor vehicles to be loaded upon or unloaded from ships, to and from the point where such vehicles are taken over by, or released from 'the hook', to employees who are members of, or represented by, Local 1291, International Longshoremen's Association, rather than to employees who are members of or represented by, Local 14 * * * or who are not members of or represented by Local 1291, * * *.'
 
 
 [7]
 See also Douds v. Milk Drivers & Dairy Employees Union, 2 Cir., 1957, 248 F.2d 534; Retail, Wholeasale & Department Store Union v. Rains, 5 Cir., 1959, 266 F.2d 503; American Federation of Radio & Television Artists v. Getreu, 6 Cir., 1958, 258 F.2d 698; Madden v. International Organization of Masters, Mates & Pilots, 2 Cir., 1958, 259 F.2d 312; Madden v. International Hod Carriers' & Common Laborers' Union, 7 Cir., 1960, 277 F.2d 688
 
 
 [8]
 There certainly was one such instance. There were, at most six. The record is far from clear on this important point. It is even less clear with respect to the number of times 15-man gangs were successfully shaped and employed. There were some such occasions