Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on Behalf of The NATIONAL LABOR RELATIONS BOARD, Petitioner-Appellee,

v.

LOCAL 25, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, Respondent-Appellant (two cases).

Nos. 362, 363, Dockets 29366, 29367.

United States Court of Appeals Second Circuit.

Argued March 9, 1965.

Decided April 27, 1965.

■■■

Allison W. Brown, Jr., Atty., N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Julius G. Serot, Asst. Gen. Counsel, Frank H. Itkin, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner-appellee.

Ernest Fleischman, New York City (Delson & Gordon, New York City, on the brief; David Ian Kramer, New York City, of counsel), for respondent-appellant.

Before SMITH and MARSHALL, Circuit Judges, and DOOLING, District Judge.*

MARSHALL, Circuit Judge:

These consolidated appeals arise from two orders entered by the District Court for the Eastern District of New York on application of the Regional Director of the Second Region of the National Labor Relations Board. These orders were granted pursuant to § 10(*l*) of the National Labor Relations Act, 29 U.S.C. § 160(*l*), and they, in essence, temporarily enjoin Local 25, International Brotherhood of Electrical Workers, AFL-CIO, from picketing two different construction sites during the pendency of certain proceedings before the Board.

Brunswick Hospital site. In May 1964 the Brunswick Hospital Center, Inc., Amityville, New York, commenced construction of an additional wing. Amityville Physicians Realty Corp. owned the property on which the hospital was situated, and acted as general contractor for the construction. Dr. Benjamin Stein was director of the hospital and president of the Realty Corp., and he and his wife were sole stockholders of both corporations. Jules Stein, employed by the hospital, acted on behalf of the Realty Corp. in soliciting bids. On August 14, 1964 Sarrow Suburban Electric Co., Inc. received the electrical subcontract for labor only and several days later it signed a collective agreement with Local 199, Industrial Workers of Allied Trades, affiliated with the National Federation of Independent Unions.

Prior to this award of the electrical subcontract, the business agent of Local 25, Joseph Bermel, contacted Jules Stein on two occasions. The first occasion was in May 1964 when Bermel telephoned Stein. Bermel learned that the subcontracting had not yet been awarded, and offered to send a list of subcontractors with whom Local 25 had collective agreements. Jules Stein subsequently received the list, to which Bermel's business card

was stapled; of this list of 50 to 75 names, five or six names were circled. Stein testified that "There was something in the [telephone] conversation which led me to believe that I should give preference to the names which had been circled"; and Bermel testified that in the course of the conversation he explained "I will encircle or underline several of those that I know have experience in a job of this nature." In July 1964 Bermel telephoned Jules Stein for the second time inquiring as to whether the electrical subcontracting had been awarded. Bermel was told that it had not, and he was assured that "the man who got the job would be a union man," to which Bermel supposedly replied, "as long as he is one of the men whose name appears on that list I sent you, you will have no trouble."

On August 21, seven days after the electrical subcontract had been awarded, Bermel visited the construction site and had a discussion with Dr. Stein in the presence of the subcontractor handling the concrete work. Upon learning that the electrical subcontract had been awarded to Sarrow, and that Sarrow had a collective agreement with Local 199, Bermel according to Dr. Stein's testimony, urged Dr. Stein to break his contract with Sarrow. Bermel advised, according to this same testimony, that if the contract were broken, "he would supply an electrical contractor who would meet the same price as Sarrow" and that if the contract were not broken, there would be "trouble" and "a work stoppage." Dr. Stein refused to break the contract with Sarrow. This confrontation, with little modification, was repeated twice more, on August 25 and August 28, and in the latter instance Walter Kraker, the business manager for Local 25, expressed the viewpoint previously expressed by Bermel. Respondent's account of these confrontations does not seriously differ from that just outlined, except that respondent insists that no work stoppage was threatened and that neither Bermel nor Kraker ever mention-

---

* Sitting by designation.

ed or claimed, on behalf of Local 25, "jurisdiction over the electrical work."

Sarrow commenced the electrical work on August 28. On September 3, Local 25 started picketing the construction site, carrying placards and distributing handbills, addressed "To The Public," stating: "The electricians employed by Sarrow Suburban Electric, Inc. are not working under wages and conditions established by Local Union 25, IBEW, AFL-CIO. We have no dispute with any other employer at this site." (Petitioner does not contend that the wages and conditions offered Local 199 employees were not below Local 25 standards.) Carpenters and laborers of the concrete subcontractor walked off the job, and this interfered with the progress of the construction job, although Sarrow's employees and the employees of some other subcontractors attempted to work during the picketing.

On September 14, the hospital and Sarrow filed unfair labor charges with the Regional Director, claiming that Local 25's picketing was in furtherance of a jurisdictional dispute and thus violative of § 8(b) (4) (i) (ii) (D) [1] of the Act (hereafter simply § 8(b) (4) (D)). The Regional Director investigated the charge and on October 9 petitioned the District Court under § 10(l) of the Act for injunctive relief pending final disposition of the proceedings before the Board; the Regional Director also requested a temporary restraining order to prevent irreparable injury pending the hearing on the petition. The District Court issued a temporary restraining order and conducted a hearing on an order to show cause, subsequent to which it entered its order granting the temporary injunction, from which this appeal was taken.

East End Synagogue site. In July 1964 Emmett Electric Company was engaged for the electrical subcontracting involved in the construction of the East End Synagogue, Long Beach, New York. Emmett's employees were members of Local 199 and had a collective agreement with that union. On September 14, 1964, Joseph Cavanaugh, another business representative of Local 25, visited the construction site, apparently before the electrical work actually began, and, not unexpectedly, inquired of the general contractor's job superintendent as to whether the electrical subcontract had been awarded. There is some dispute as to what transpired in the ensuing conversation after Cavanaugh learned that Emmett had received the subcontract. The job superintendent testified that Cavanaugh told him that Emmett's employees were not members of Local 25 and that unless Emmett was removed and replaced by electricians associated with Local 25, there would be picketing; he also testified that Cavanaugh gave him a list of electrical subcontractors employing Local 25 electricians. Cavanaugh admitted giving the job superintendent the list, but insisted that at that time he merely doubted whether Emmett employed Local 25 members and that he gave the job superintendent the list of Local 25 contractors so that "he could choose one of these contractors" "in case Emmett was a non-union contractor or not signed

---

1. "29 U.S.C. § 158. Unfair labor practices
 "(b) It shall be an unfair labor practice for a labor organization or its agents—
 *    *    *    *    *
 "(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or
 (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
 "(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:  *   *   *."

with Local 25." He denied that there was any threat of picketing. Cavanaugh also testified that he did not "claim or demand jurisdiction of the work."

In any event, on September 16, Local 25 began picketing the site with placards, addressed "To The Public" stating: "The electricians of Emmett Elect. are not working under wages and conditions established by Local Union 25, I. B. E. W., AFL-CIO. We have no dispute with any other employer at this site." (As in the instance of the Brunswick Hospital proceeding, petitioner did not dispute the truthfulness of the claim that the electricians were working for wages and conditions below Local 25 standards.) Plumbers and laborer employees of other contractors walked off the job, and this interfered with the progress on the construction. After about ten days of picketing, on about September 26, Emmett was ordered off the job by the general contractor and replaced by a Local 25 contractor, at which time the picketing ceased.

On September 18, Emmett alone filed unfair labor charges with the Regional Director, charging Local 25 with having violated § 8(b) (4) (D) of the Act by picketing the construction site in furtherance of a jurisdictional dispute. On October 9, after investigating the charges, the Regional Director filed a petition in the District Court seeking to restrain Local 25 from such further picketing pending adjudication by the Board. A hearing was conducted, and on November 30 the order appealed from was entered, temporarily enjoining Local 25.

■ In passing on a petition for a § 10(l) injunction, the federal district court does not have the authority nor the responsibility of deciding whether respondent had committed the unfair labor practice charged, or in the context of these cases, whether Local 25 had violated § 8(b) (4) (D). Schauffler v. Local 1291, Int'l Longshoremen's Ass'n, 292 F. 2d 182, 187–188 (3 Cir. 1961); Douds v. Milk Drivers & Dairy Employees Union, 248 F.2d 534 (2 Cir. 1957); see generally, McLeod v. Business Mach. & Office Appliance Mechanics, 300 F.2d 237 (2 Cir. 1962). Section 10(l) merely provides a means of preserving the status quo while the unfair labor practice charge is being adjudicated. When relief is sought under § 10(l), the Board, rather than the federal district court, remains the "primary fact finder" and "primary interpreter of the statutory scheme," Schauffler v. Local 1291, Int'l Longshoremen's Ass'n, supra, 292 F.2d at 188, subject, of course, to judicial review by a court of appeals pursuant to § 10(e) and § 10(f). For the purpose of determining whether an unfair labor practice had been committed, it is the Board that initially finds the facts and assesses the legal propositions upon which the charge is predicated. The Board's position as the "single expert federal agency," Local 100, United Ass'n of Journeyman v. Borden, 373 U.S. 690, 696, 83 S.Ct. 1423, 10 L.Ed.2d 638 (1963), charged by Congress with enforcing and formulating policy under the National Labor Relations Act is thus preserved. When a violation of § 8(b) (4) (D) is charged, it is particularly important that this position be preserved, for the federal labor law derived from this section is still in its germinal stage.

■ In § 10(l) proceedings the function of the federal district court consists of determining (1) whether the temporary injunctive relief would be "just and proper" in terms of general equitable principles and (2) whether there is "reasonable cause" for the Regional Director "to believe such [unfair labor practice] charge is true and that a complaint should issue," which this Court in McLeod v. Business Mach. & Office Appliance Mechanics, supra, 300 F.2d at 241, interpreted to mean that there must be a "reasonable possibility" that this unfair labor practice charge will be sustained. The District Court below found, though in a far too conclusory manner, that such temporary injunctive relief would be "just and proper" and that there was a "reasonable possibility" of the Board sustaining the charge. Having found that the District Court did not err in making either determination, we affirm.

The District Court did not abuse its discretion in deciding that equitable relief would be "just and proper." The injunction against the picketing at the Brunswick Hospital site would have a serious, and conceivably unjustified, adverse impact on Local 25's interests, even though the injunction is limited to the duration of the unfair labor proceedings before the Board; for the electrical subcontracting is likely to be completed before the Board finally adjudicates the unfair labor charge, especially since, as required by the CBS case (N. L. R. B. v. Radio & Television Broadcast Engineers Union, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961)), the Board must conduct proceedings under § 10(k) to determine which union is entitled to the work prior to adjudicating the § 8(b) (4) (D) charge. However, balanced against this probable and possibly unjustified adverse impact on Local 25, is the equally important fact that Local 25's picketing might be unlawful and that it posed an imminent threat of irreparable injury, *viz.*, halting the construction of the additional wing of the hospital. The situation with the East End Synagogue is slightly more troublesome, for although Local 25 had been picketing when the unfair labor practice charge was filed, this picketing had ceased (because the general contractor had succumbed) by the time the Regional Director applied for the § 10(*l*) injunction.[2] Nevertheless, the District Court was entitled to reason that an injunction would contribute toward stabilizing the situation, if, for example, the general contractor decided to reassign the work to Emmett, and that this possible benefit outweighs the possible unjustified adverse impact to Local 25.

We are also of the opinion that the court below did not err in finding that there is a "reasonable possibility" that in each case the unfair labor charge will be sustained, in the first instance, by the Board. Local 25 does not seriously contest the claim that there is "reasonable cause" to believe that its picketing had the effect of inducing or encouraging other employees at the construction sites to refuse to perform services and that it had a coercive or restraining influence. Instead, the controversy centers on whether Local 25's picketing had as its object that proscribed in subparagraph (D) of § 8(b) (4). Petitioner seizes on the language of this section, which prohibits coercive conduct "where * * * an object thereof is * * * forcing or requiring any employer to assign particular work to employees in a particular labor organization * * * to employees in another labor organization," and insists that an object of Local 25's picketing was to have the work originally assigned to a subcontractor employing Local 199 members to be reassigned to a subcontractor using Local 25 members. Respondent's reply is as follows. First, the sole purpose of the picketing was to maintain area standards, as the placards and handbills proclaimed. Secondly, the "immediate" purpose of the picketing was to maintain area standards, and such legitimate informational picketing is not proscribed by § 8(b) (4) (D), even though it is assumed *arguendo* that the picketing *also* had as one of its ob-

2. In the Brunswick Hospital case the hospital and the general contractor are protected by the injunction; Local 25 is temporarily enjoined from picketing and engaging in other conduct likely to induce a strike at that particular construction site. The scope of the injunction in the East End Synagogue case is less restricted. There the employer protected by the coercive or strike-inducing conduct of Local 25 is not the property owner or the general contractor, but the electrical subcontractor (Emmett). Despite the far reaching language of that injunction, we understand this protection to be limited to Emmett's activities at the East End Synagogue site. It is difficult to understand on what basis the District Court could have found that at whatever job Emmett happened to be working during the pendency of the unfair labor practice proceeding, it would be exposed to a threat of irreparable harm at the hands of Local 25 sufficient to justify § 10(*l*) injunctive relief simply because it was so threatened at the East End Synagogue job.

jects that specified in subparagraph (D) of § 8(b) (4). And, thirdly, even if it is assumed *arguendo* that the picketing had no other object than to bring pressure on the employer to reassign the work to a Local 25 subcontractor, this conduct was not unlawful under § 8(b) (4) (D), because it was not in furtherance of a "jurisdictional dispute" but merely an effort to obtain employment for its members at a particular construction site.

We disclaim any interest in assessing these arguments other than to say that they still permit a finding by the District Court that there is "reasonable cause" to believe that the elements of an unfair labor charge are present. Regardless of whether the Board, in the first instance, will be persuaded by any of respondent's arguments when the unfair labor practice charge is adjudicated, we cannot say at this juncture that these arguments render the possibility of the Board finding that Local 25 had committed the unfair labor practice less than reasonable.

■ Although the problems just discussed are common to both the Brunswick Hospital and East End Synagogue cases, in the former respondent makes the further argument that "reasonable cause" is lacking because the Board would not take "jurisdiction" of the case. This argument has two aspects: the Board would not take jurisdiction either because, according to the Board's own standards, Siemons Mailing Service, 122 N.L.R.B. 81 (1958), the Realty Corp., as general contractor at the hospital site, is not engaged in interstate commerce, or because the Board has previously declined to assert jurisdiction over proprietary hospitals that "are essentially local in nature," Flatbush General Hospital, 126 N.L.R.B. 144 (1960). Both contentions are entirely devoid of merit. Sufficient evidence was adduced at the hearing befor the District Court to support its conclusion that, within the year, the Realty Corp. "has received and will receive, goods and materials valued at more than $50,000 from points outside" the state. And the objection to jurisdiction based

on the alleged, "essentially local nature" of Brunswick Hospital merely reflects a confusion between the "construction" of a building and "its later use," N. L. R. B. v. Denver Building and Construction Trades Council, 341 U.S. 675, 684, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).

The orders below, in so far as they temporarily enjoin Local 25 from picketing and engaging in other coercive or strike-inducing action at the Brunswick Hospital and East End construction sites during the period within which it takes the National Labor Relations Board to adjudicate the unfair labor practice charges, are affirmed.