Merle D. VINCENT, Jr., Regional Director of the Third Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL UNION NO. 532, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL-CIO, Respondent.

Civ. No. 1970-473.

United States District Court,
W. D. New York.

Nov. 25, 1970.

Thomas H. Ramsey, Regional Atty., N.L.R.B., Region 3, Buffalo, N. Y. (David W. Larrison, Buffalo, N. Y., of counsel), for petitioner.

Blitman & King, Syracuse, N. Y., (Bernard T. King, Syracuse, N. Y., of counsel), for respondent.

CURTIN, District Judge.

The petitioner seeks a temporary injunction pursuant to Section 10($l$) of the National Labor Relations Act pending the final disposition of a charge filed by the D. W. Winkelman Co., Inc. [Winkelman] before the National Labor Relations Board, alleging the respondent, Local Union No. 532, United Brotherhood of Carpenters and Joiners of America, AFL-CIO [Carpenters], has engaged in unfair labor practices within the meaning of Section 8(b) (4) (D) of the Act. The Carpenters, according to petitioner's allegations, have unlawfully caused work stoppages in the course of a jurisdictional dispute with members of Local 7, Laborers International Union of North America [Laborers]. The dispute concerns the jobsite unloading of wooden and metal materials with the assistance of power operated cranes.

This court held a hearing to develop the facts alleged in the petitioner's application for a temporary injunction. Representatives of Winkelman and the Carpenters testified, but the Laborers were not served and did not make an appearance. No Laborer witnesses were called. The parties have informed the court that the Board has started to take testimony in a 10-K proceeding, but that the hearing is not completed as yet. The following constitutes this court's findings of fact and conclusions of law.

Winkelman, a member of the Associated General Contractors of America [A. G.C.], has a contract to construct a part

of the Southern Tier Expressway in New York State. Through the A.G.C., Winkelman is a party to collective bargaining agreements with both the Carpenters and the Laborers.

Article I, Section 4 of the agreement between the Carpenters and A.G.C. provides:

"The loading, unloading, stringing of all wood products, metal, masonry, plastic or any other materials put in place by the members of the Brotherhood shall be the jurisdiction of the (Carpenters)."

Article XIII, Jurisdictional Disputes, provides as follows:

"1. The Employer agrees that he will assign work in accordance with the rules and regulations of the National Joint Board for the Settlement of Jurisdictional Disputes. (Joint Board.)

2. In the event that one or more of the parties to a jurisdictional dispute are not party to the National Joint Board, it is agreed that the Employer and the Union will abide by and recognize existing international jurisdictional agreements."

On prior construction projects in the same geographical area, the contractors customarily assigned the unloading work to the Carpenters.

Shortly before the work started, on July 22, 1970 Winkelman held two separate pre-job conferences, one with the Laborers and the other with the Carpenters. At a brief meeting with the Carpenters, the work which became the subject of the dispute was not discussed at all. However, at the other meeting, Laborer representatives claimed the work of unloading the materials in question. Mr. Cox, Winkelman's labor representative, testified that no definite commitment was given to the Laborers at that time but the problem was left for a second meeting to be held a few days later. He did not attend the second meeting, and what occurred at that meeting is not clear. However, it is clear that the allegation made by the petitioner that the work of unloading materials was as-

signed originally to the Laborers is not supported by the evidence for, on July 27, when the actual construction began, the Carpenters unloaded the materials coming to the jobsite. They continued to perform this work from day to day until the afternoon of August 7, 1970, except on one occasion on about July 31, when, because of the shortage of carpenters, two laborers assisted two carpenters in unloading 20,000 board feet of 2 x 4's. On the afternoon of August 7, Mr. Harvey, Winkelman's job superintendent, ordered the Carpenters to cease performing this work and reassigned it to the Laborers. At that time, Mr. Hakes, the Carpenter steward, questioned Mr. Harvey about why he had taken this action. The superintendent said he was told to reassign the work to the Laborers to see what would happen.

On August 10, Mr. Hughes, Carpenter representative, met with Mr. Serafini, project superintendent for Winkelman. At that time, Mr. Serafini said that he would reassign the Carpenters to the work. However, on about August 17, the Laborers continued the work of unloading. Following this, on August 18, Mr. Hughes sent a telegram to the Carpenters International complaining of the assignment and requesting that the procedures called for by Article XIII of the agreement be put into effect, and that the dispute be referred to the Joint Board. On August 24, the Joint Board sent a letter to Winkelman stating that, if the work was originially assigned to the Carpenters, Winkelman was directed "to proceed immediately with the disputed work in accordance with the original assignment." The Carpenters received their copy of this letter on August 26, after it had been processed through the International office. However, during a meeting between the parties on August 27, Winkelman representatives denied receiving the letter from the Joint Board. At this meeting, Hughes insisted that the power rigging was the Carpenters' work, but the Winkelman representatives refused to agree to this. Mr. Cox, the Winkelman labor representa-

tive, testified that, if Hughes could have produced a Joint Board decision at the August 27 meeting which assigned work to the Carpenters, Winkelman would have followed the Joint Board decision and assigned the work to the Carpenters. However, a few days later, the company took a different position. The new position was that Winkelman was not bound by the decisions of the Joint Board for, on September 1, 1970, Mr. O'Dell, Laborer counsel for the A.G.C., sent a telegram to the Carpenters stating:

> "AGC and its member contractors are not party to the Joint Board. We treat (Joint Board) letter as a nullity and will press for injunction and 10K hearing in NLRB."

and that

> "Damages by reason of work stoppage are accruing on a daily basis."

On August 28, the day following the meeting during which Winkelman refused to reassign the work to the Carpenters, the Carpenters walked off the job and continued off until September 4. At that time, because of the threat of a damage suit, Mr. Hughes persuaded his members to return to work. They remained on the job since then except that, from time to time, when Laborers performed the disputed work, individual members of the Carpenters have refrained from working for a short time.

Although it would appear that the agreement requires that the parties are bound by Joint Board decisions, nevertheless, Winkelman takes the position that they are relieved of this obligation since the A.G.C. refused to enjoin the Board in 1969 after a new Joint Board was established. Whether this position has any merit is beside the point for the agreement also provides that, even though one of the parties is not a member of the Joint Board, nevertheless, in jurisdictional disputes it will recognize the existing international agreements. Further, neither Mr. Cox, Winkelman's labor representative, nor Mr. Hughes,

Carpenters' representative, knew of this position until the September 1 telegram was received.

Petitioner's argument that, since Laborers are not members of the Joint Board, the Joint Board cannot effectively act is not supported by the evidence In September, after the Joint Board sent a notice to the Laborers, they responded by assigning a representative to initiate a proceeding under the Joint Board rules. A letter from the Joint Board was received in evidence, stating that the Laborers are an affiliate and bound by Joint Board rules.

■■ Section 8(b) (4) (D) of the Labor-Management Relations Act forbids a union from engaging in a work stoppage with the object of forcing the employer to assign particular work to employees of that union rather than to the employees of another, unless such employer is failing to conform to a certification order of the Board. There is no Board certification order for this work. Before a Section 10(*l*) temporary injunction may issue, the court must be satisfied that there was reasonable cause for the Regional Director to believe that the unfair labor charge is true and that, after a Board hearing, there is a reasonable possibility that the unfair labor charge will be sustained and that, under all of the circumstances, the temporary injunctive relief would be just and proper in terms of general equitable principles. McLeod v. Local 25, International Brotherhood of Electrical Workers, 344 F.2d 634, 638 (2d Cir. 1965).

■ No doubt when this matter was first presented to the Regional Director, there was reasonable cause for him to believe that the Carpenters were guilty of an unfair labor practice. Further, although all of the allegations made by the petitioner were not borne out by the evidence, there is a reasonable possibility that after a hearing the N.L.R.B. may find the Carpenters guilty of an unfair labor practice.

However, even though the Board may take such action, nevertheless, this court

is of the opinion that, under the circumstances presented here, in terms of general equitable principles, the issuance of a temporary injunction would not be just and proper.

From the evidence, it appears that area practice and the agreement between the parties called for the work to be performed by the Carpenters. Indeed, they actually did the work from the beginning of construction on July 27 until August 7, when Mr. Harvey assigned the Laborers to it.

Because of these facts, the Carpenters were understandably upset, but their first reaction was restrained and proper. Mr. Hughes arranged a meeting with Mr. Serafini and Mr. Cox. This meeting was held on August 10. The court believes the testimony of Mr. Hughes that, at the meeting, Mr. Serafini told him that the Carpenters would be reassigned to the work. However, that promise was not fulfilled. Instead, the Laborers continued to perform the work.

Again the Carpenters' response was proper. Following his understanding of the agreement, Mr. Hughes petitioned the Joint Board for relief. When notified of the Joint Board letter directing that the contractor reassign the work in accordance with the original assignment, the first reaction of Winkelman was that they had not received a copy of the letter. Winkelman refused to allow the Carpenters to do the work. It was only after this that the Carpenters walked off. It appears that Mr. O'Dell's telegram of September 1, 1970, representing that Winkelman was not bound by Joint Board decisions, was an afterthought. Neither Mr. Cox nor Mr. Hughes had ever heard of that position before. Certainly, whatever its validity, it had nothing to do with the assignment of work to the Laborers.

Generally, the issuance of an injunction is an extraordinary remedy. There is no threat of a serious interference with the construction project. No stoppages have occurred since about the 20th of October, and it generally appears that the status quo will continue.

Therefore, for the above reasons, the application of the petitioner for a temporary injunction is denied.

So ordered.