364 F.Supp. 205 (1973)
Bernard L. BALICER, Acting Regional Director of the Twenty-Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,
v.
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO, and New York Shipping Association, Inc., Respondents.
Civ. A. No. 1155-73.
United States District Court, D. New Jersey.
September 18, 1973.
*206 Robert M. Schwarzbart, NLRB, Newark, N. J., for petitioner.
Laurence H. Silberman, Stephen Robbins, Washington, D. C., for charging party, CEI.
Irwin Herschlag, Lyndhurst, N. J., Gleason & Miller, by Thomas W. Gleason, Jr., Julius Miller, New York City, for respondent ILA.
Carpenter, Bennett & Morrissey, by Robert E. Turtz, Newark, N. J., Lorenz, Finn, Giardino & Lambos, by Constantine P. Lambos, Jacob Silverman, Donato Caruso, New York City, for respondent NYSA.

*207 OPINION
LACEY, District Judge:
This proceeding is before the Court on a petition filed by the Acting Regional Director of the Twenty-second Region of the National Labor Relations Board (Board), pursuant to § 10(l) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(l) (hereinafter referred to as the Act), for a preliminary injunction pending the final disposition of the matters involved herein and now pending before the Board on charges filed by Consolidated Express, Inc. (CEI).[1] It is alleged that respondent International Longshoremen's Association, AFL-CIO (hereinafter referred to as ILA or Union), has engaged in, and is engaging in, an unfair labor practice within the meaning of § 8(b)(4)(ii)(B) of the Act (see text infra), which proscribes so-called secondary boycotts and other secondary pressure to require another employer to cease doing business with other employers; and that the Union and respondent New York Shipping Association, Inc. (NYSA), have engaged in, and are engaging in, an unfair labor practice within the meaning of § 8(e) of the Act, which proscribes entering into and maintaining so-called "hot cargo" contracts.
This petition follows from the petitioner having concluded that there is reasonable cause to believe respondents have engaged in the aforesaid unfair labor practices charged, and that a complaint of the Board based on the charges should issue.
The following constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.
CEI at its Maspeth, New York facility consolidates, containerizes and forwards cargoes for sea shipment and removes incoming cargoes from containers; and in the operation of its business annually provides and performs such services valued in excess of $50,000 within states and territories of the United States other than the State of New York.
NYSA, with offices in New York City, is an incorporated association of employers engaged in various operations involved in the shipment of cargo, freight and transportation of passengers in and out of the Port of New York. NYSA conducts collective bargaining negotiations and enters into collective bargaining agreements on behalf of its employer-members, including Sea-Land Service, Inc. (Sea-Land), Elizabeth, New Jersey; Seatrain Lines, Inc. (Seatrain), Weehawken, New Jersey; and Transamerican Trailer Transport, Inc. (TTT), *208 Richmond, New York. Employer-members of NYSA carry general cargo in interstate and foreign commerce valued in excess of $1,000,000 out of the various piers of the Port of New York destined directly to foreign countries and to states of the United States other than the States of New York and New Jersey.
Council of North American Shipping Associations (CONASA) with offices in New York City, is an association of shipping associations whose members, which include NYSA, engage in the business of conducting collective bargaining negotiations on behalf of their employer-members and enter into collective bargaining agreements covering the employees of their employer-members.
The Union is a labor organization within the meaning of the Act [§§ 2(5), 8(b)(4)(ii)(B), 8(e) and 10(l)] and at all times material herein has been engaged within this District in transacting business and promoting and protecting the interests of its employee-members. The labor practices complained of occurred within this District. Thus venue is proper and this Court has jurisdiction over this matter. See § 10(l) of the Act.
For many years, the Union has been the certified bargaining representative of the longshoremen employed by the employer-members of NYSA, and has negotiated and entered into a series of collective bargaining agreements with NYSA covering the terms and conditions of employment of these employees.
From 1965, when CEI began business operations under its present identity,[2] it has been engaged as a non-vessel operating common carrier (NVOCC) in the trade between the Port of New York and Puerto Rico, at its premises, first in New York, New York, and subsequently, in Maspeth, New York, and in Carolina, Puerto Rico. CEI is also known in the shipping industry as a consolidator. As such, it receives less than container-size cargoes (LCL or LTL) from those desiring to ship same, unitizes or consolidates these crates within containers, and forwards them to the steamship companies to be loaded on board Puerto Rico-bound ships. Conversely, incoming cargoes are delivered in containers to CEI's premises, located away from the waterfront, where the containers are opened and the crates separated for delivery to the ultimate consignees.
Prior to the beginning of August 1973 CEI did not have any trucking employees, but had contracted with U.S. Trucking Co., whose employees were represented by Local 807, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, to do all their loading and delivery work at, and to and from CEI's Maspeth facility, and the various shipping lines in the Port of New York, including Port Newark, New Jersey. Local 807 members employed directly by U.S. Trucking Co. also performed the work of filling (stuffing) the containers with respect to outgoing cargoes and the unloading (stripping) of incoming containers on CEI's Maspeth premises. At present CEI has terminated its relationship with U.S. Trucking Co., but does the identical work using its own direct employees, represented by the same Local 807, Teamsters. Neither CEI nor U.S. Trucking Co. is or has been a member of NYSA or a party to any collective bargaining *209 agreement between the Union and NYSA, or between the Union and CONASA.
The containers used by CEI, presently approximately 40 feet long, were, prior to late March 1973, furnished it by the steamship-stevedoring companies engaged in the New York-Puerto Rican trade, Sea-Land, Seatrain and TTT, all NYSA members. These companies, owners of the containers, employ members of the Union. These members had previously loaded CEI-stuffed containers on board ship and unloaded the incoming containers, for delivery to CEI's premises. The Board contends that this loading and unloading had been performed by these Union members until March 1973 almost invariably without stripping or stuffing the containers on the piers before starting them on their way.[3] From in or about the last week in March 1973, the Board alleges, the Union has been successful in getting NYSA, including its employer-members, Sea-Land, Seatrain, and TTT, to cease furnishing containers to CEI and to stop handling freight for CEI. As a result, CEI claims to have suffered severe financial loss and to be close to being driven out of business.
It is charged that the Union has brought about this halt to the dealings between Sea-Land, Seatrain, TTT, and CEI, by enforcing, and threatening further to enforce, the liquidated damages provision in the Union's Memorandum of Understanding with CONASA,[4] executed in mid-February 1972, and effective from November 14, 1971, to September 30, 1974. This Memorandum sets forth Rules on Containers (hereinafter sometimes referred to as Rules) and provides therein for liquidated damages of $1,000 per container payable for each act of evasion.
The Rules are intended to establish a system under which, with certain exceptions, inbound and outbound containers handled through the Port of New York are stripped and stuffed at the waterfront by members of the Union employed by employer-members of NYSA at the longshore pay rate, whether or not the containers require such further treatment.
The Rules, which have been in the Union's collective bargaining agreements with the NYSA since 1968,[5] currently provide in pertient part as follows:
RULES ON CONTAINERS
The following provisions are intended to protect and preserve the work jurisdiction of longshoremen and all other ILA crafts at deepsea piers or terminals. . . .
Rule 1. Definitions and Rule as to Containers Covered
Stuffingmeans the act of placing cargo into a container.
Strippingmeans the act of removing cargo from a container.
Loadingmeans the act of placing containers aboard a vessel.
Dischargingmeans the act of removing containers from a vessel.
These provisions relates solely to containers meeting each and all of the following criteria:
(a) Containers owned or leased by employer-members (including containers *210 on wheels) which contain LTL loads or consolidated full container loads.
(b) Such containers which come from or go to any person (including but not limited to a consolidator who stuffs containers of outbound cargo or a distributor who strips containers of inbound cargo and including a forwarder, who is either a consolidator of outbound cargo or a distributor of inbound cargo) who is not the beneficial owner of the cargo.
(c) Such containers which come from or go to any point within a geographical area of any port in the North Atlantic District described by a 50-mile circle with its radius extending out from the center of each port. Rule 2. Rule of Stripping and Stuffing Applied to Such Containers
A container which comes within each and all of the criteria set forth in Rule 1 above shall be stuffed and stripped by ILA longshore labor. Such ILA labor shall be paid and employed at longshore rates under the terms and conditions of the General Cargo Agreement. Such stuffing and stripping shall be performed on a waterfront facility, pier or dock. No container of cargo shall be stuffed or stripped by ILA longshore labor more than once. Notwithstanding the above provisions, LTL loads or consolidated container loads of mail, of household goods with no other type of cargo in the container, and of personal effects of military personnel shall be exempt from the rule of stripping and stuffing.
Rule 3. Rules on No Avoidance or Evasion
* * * * * *
(e) Failure to stuff or strip a container as required under these rules will be considered a violation of the contract between the parties. Use of improper, fictitious or incorrect documentation to evade the provisions of Rule 2 shall also be considered a violation of the contract If for any reason a container is no longer at the waterfront facility at which it should have been stuffed or stripped under the rules, then the steamship carrier shall pay, to the joint Container Royalty Fund, liquidated damages of $1,000 per container which should have been stuffed or stripped. Such damages shall be used for the same purposes as the first Container Royalty is used in each port. If any carrier does not pay liquidated damages within 30 days after exhausting its right to appeal the imposition of liquidated damages to the Committee provided in (g) below, the ILA shall have the right to stop working such carrier's containers until such damages are paid.
* * * * * *
On January 29, 1973, to obtain enforcement of the Rules, representatives of CONASA, on behalf of its employer-members, including NYSA, and representatives of the Union, meeting in Dublin, Ireland, executed a supplemental agreement concerning these Rules which provides in pertinent part as follows:
Enforcement of Rules on Containers
* * * * * *
1. (a) All outbound (export) consolidated or LTL container loads (Rule 1 containers) shall be stripped from the container at the pier by deep-sea ILA labor and cargo shall be stuffed into a different container for loading aboard ship.
1. (b) All inbound (import) consolidated or LTL cargo (Rule 1 containers) for distribution shall be stripped from the container and the cargo placed on the pier where it will be delivered and picked up by each consignee.
2. No carrier or direct employer shall supply its containers to any facilities operated in violation of the Rules on Containers including but not limited to a consolidator who stuffs containers of outbound cargo or a distributor who strips containers of inbound cargo and including a forwarder who is either a consolidator or a *211 distributor. No carrier or direct employer shall operate a facility in violation of the Rule on Containers which specifically require that all containers be stuffed or stripped at a waterfront facility (pier or dock) where vessels normally dock.
A list shall be maintained of consolidation and distribution stations which are operated in violation of the Rules for the information of all carriers and direct employers. Any container consolidated at or distributed from such facilities shall be deemed a violation and subject to the rules on stuffing and stripping.
* * * * * *
Petitioner charges that since the execution of the January 1973 agreement, the Union, by threatening to and by actually assessing liquidated damages at the rate of $1,000 per container per alleged evasion, has caused NYSA and its members, Sea-Land, Seatrain, and TTT, to cease handling freight for CEI, and to no longer furnish CEI with containers necessary for the operation of its consolidation business. Sea-Land, Seatrain, and TTT could still continue to do business with CEI, as before, but all containers received at the pier bound to or from CEI would have to be stripped and restuffed by members of the Union at the expense of those companies, causing not only an onerous financial burden upon them, but according to CEI, disruption of its packing plan per container and consequent damage to its business. Since about the middle of March 1973, it is charged, the three named carriers have refused to furnish containers to CEI, or to handle or transport CEI's freight.
Additionally, the Board alleges that the Union's tactics are further evidenced by the notice, to all carriers and direct employers, issued by the Contract Board of NYSA and ILA, and dated April 13, 1973, announcing that carriers had been assessed liquidated damages for violations of the Rules on containers stuffed or stripped at the premises of 14 companies listed in the notice. CEI is one of the 14 listed therein.
Thus it is the Board's contention that the Union has violated § 8(b)(4) (ii)(B) of the Act by threatening, coercing and restraining NYSA, Sea-Land, Seatrain, TTT and other persons engaged in commerce or in industries affecting commerce, with an object of forcing or requiring NYSA, Sea-Land, Seatrain and TTT, and other persons, to cease doing business with CEI.
Section 8(b)(4)(ii)(B) of the Act provides:
(b) It shall be an unfair labor practice for a labor organization or its agents
* * * * * *
(4) . . . (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is
* * * * * *
(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . . .
This section, customarily referred to as the section prohibiting secondary boycotts, does not prohibit a union from taking traditional primary action against an employer, e.g., by appealing to his employees not to perform services in furtherance of a labor dispute with that employer. It does, however, prevent a union from bringing pressure to bear on the primary employer through *212 another employer, commonly referred to as a "secondary" employer, in furtherance of such a dispute.[6] The Board contends that the Union's enforcement of the liquidated damages provisions of the Memorandum of Understanding with CONASA is unlawful secondary activity proscribed by this section of the Act.
The Board also charges that the Union and NYSA have violated § 8(e) of the Act by entering into, maintaining, and enforcing the 1968 Rules on Containers and subsequent enforcement rules of January 29, 1973, against CEI.
Section 8(e) of the Act provides in pertinent part:
It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void . . . .
Section 8(e) was added by the 1959 amendments to the Act to close a loophole in the secondary boycott provisions effectuated through the use of voluntary "hot cargo" agreements. Simply stated, a "hot cargo" agreement is one between an employer and a union in which the employer agrees not to handle or work on any freight or product coming from another person with whom the union has a dispute. See Amalgamated Lithographers of America (Graphic Arts Employers Ass'n), 130 N.L.R.B. 985, 47 L. R.R.M. 1374 (1961). Prior to the 1959 amendments, although a union could not strike or induce employees to refuse to work in order to force an employer not to handle "hot cargo" without such an agreement or to induce such an agreement, if such union pressure was not applied, and the employer voluntarily so agreed, or voluntarily adhered to such agreement previously made, the boycott was not unlawful under the Act. See Local 1976, United Brotherhood of Carpenters and Joiners of America v. N.L. R.B. (Sand Door), 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958). The amendment was aimed at eliminating such voluntary agreements with such objectives. National Woodwork Manufacturers Ass'n. v. N.L.R.B., 386 U.S. 612, 634, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).
While the language in § 8(e) is sweeping, the Supreme Court in National Woodwork Manufacturers Ass'n. v. N.L.R.B., supra, held that this section, like § 8(b)(4)(B), was intended by Congress to reach only secondary pressures, and did not apply to primary work preservation agreements. The Court concluded:
Although the language of § 8(e) is sweeping, it closely tracks that of § 8(b)(4)(A), and just as the latter and its successor § 8(b)(4)(B) did not reach employees' activity to pressure their employer to preserve for themselves work traditionally done by them, § 8(e) does not prohibit agreements made and maintained for that purpose. 386 U.S. at 635, 87 S.Ct. at 1263.
The National Woodwork case involved an employer, a signatory to a collective bargaining agreement which provided that "[n]o member of [the union] will handle . . . any doors *213 . . . which had been fitted prior to being furnished on the job," who had agreed not to use prefit doors after the union invoked the quoted provision. 386 U.S. at 615, 87 S.Ct. 1253. Charges were filed with the NLRB alleging that the "will not handle" clause was an agreement whereby "[an] employer . . . agrees to cease or refrain from handling . . . any of the products of any other employer . . ." in violation of § 8(e). It was also alleged that the union's action enforcing the clause violated § 8(b)(4) (B) of the Act. In determining whether the "will not handle" clause violated these sections the Court focused on the union's objective, to wit: whether it was the preservation of work or aimed at satisfying union objectives elsewhere (386 U.S. at 644-45, 87 S.Ct. at 1268):
The determination whether the "will not handle" sentence of Rule 17 and its enforcement violated § 8(e) and § 8(b)(4)(B) cannot be made without an inquiry into whether, under all the surrounding circumstances,38 the Union's objective was preservation of work for [the contractor's] employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere. Were the latter the case [the contractor], the boycotting employer, would be a neutral bystander, and the agreement or boycott would, within the intent of Congress, become secondary. There need not be an actual dispute with the boycotted employer, here the door manufacturer, for the activity to fall within this category, so long as the tactical object of the agreement and its maintenance is that employer, or benefits to other than the boycotting employees or other employees of the primary employer thus making the agreement or boycott secondary in its aim. The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-a-vis his own employees. [footnotes 39 and 40 omitted]
38. As a general proposition, such circumstances might include the remoteness of the threat of displacement by the banned product or services, the history of labor relations between the union and the employers who would be boycotted, and the economic personality of the industry. See Comment, 62 Mich.L.Rev. 1176, 1185 et seq. (1964).
Thus, after applying the above test, if it is determined that a union objective is one of valid work preservation, and that its activity is primary in nature, no statutory violation exists, regardless of the fact that neutral third parties may be adversely affected by that union's actions. As the Court stated, "however severe the impact of primary activity on neutral employees, it was not thereby transformed into activity with a secondary objective." 386 U.S. at 627, 87 S.Ct. at 1259.[7]
It is noted, however, that in focusing on the union's objectives, and finding the preservation of work traditionally performed to be a permissible objective, the Court was careful to distinguish those cases where the union was seeking not to preserve traditional work, but was reaching out to acquire new work:
It is arguable that Congress may have viewed the use of the boycott as a sword as different from labor's traditional concerns with wages, hours, and working conditions. But the boycott in the present cases was not used as a sword; it was a shield carried solely to preserve the members' jobs. We therefore have no occasion today to decide the questions which might arise where the workers carry on a boycott *214 to reach out to monopolize jobs or acquire new job tasks when their own jobs are not threatened by the boycotted product. [footnote omitted] 386 U.S. at 630-31, 87 S.Ct. at 1261.
See also concurring opinion of Mr. Justice Harlan, 386 U.S. at 648, 87 S.Ct. at 1270:
This, then, is not a case of a union seeking to restrict by contract or boycott an employer with respect to the product he uses, for the purpose of acquiring for its members work that had not previously been theirs.
In addition to finding the preservation of traditional work a permissible objective, the Court's opinion in National Woodwork was construed in American Boiler Manufacturers Ass'n. v. N.L.R.B., 404 F.2d 547 (8th Cir. 1968), cert. denied, 398 U.S. 960, 90 S.Ct. 2162, 26 L. Ed.2d 546 (1970), to include a type of work reacquisition. If the type of work currently being performed was sought to be preserved, the union could also seek to reaquire any portion of this current work that had been lost in the past. In effect, the court defined traditional work to include this portion of lost work. However, the court was careful to distinguish the type of work which had previously been performed but completely lost:
We express no opinion as to whether [the clause in question] can be enforced if the objective is to acquire work which unit employees had never performed or work which they may have performed in the past but have completely lost before the clause was negotiated. We hold only that the term "traditional work" includes work which unit employees have performed and are still performing at the time they negotiated a work-preservation clause. [footnote omitted] 404 F.2d at 552.
It is the position of respondents that the Rules here in question are proper work preservation rules within the meaning of National Woodwork. They claim the Rules are aimed at preserving work traditionally performed by the ILA and are a result of a primary dispute between the ILA and the NYSA that has lasted for over a decade. They have cited the history of the labor relations between the respondents over this period and it is claimed that the Rules on Containers have been a prime issue in their decade of strife that has required presidential intervention. In support of their claim that the Rules concern traditional work, they cite Intercontinental Container Transport Corp. (ICTC) v. New York Shipping Ass'n., 426 F.2d 884 (2d Cir. 1970), in which, it is claimed, the exact Rules in question (of course excluding the 1973 amendments) were upheld as traditional work.
In the ICTC case, the court was concerned with alleged anti-trust violations resulting from the Rules on Containers. In finding no anti-trust violation, the court stated:
The provisions of the collective agreement have as their object the preservation of work traditionally performed by longshoremen covered by the agreement. 426 F.2d at 887.
Moreover, respondents argue that the work in question is supportable as work "fairly claimable by the bargaining unit." Meat and Highway Drivers v. N. L.R.B., 335 F.2d 709, 713-14 (D.C.Cir. 1964). Work "fairly claimable by the bargaining unit" has also been regarded as a proper consideration in the determination of primary versus secondary activity. See National Maritime Union v. Commerce Tankers Corp., 457 F.2d 1127, 1134 (2d Cir. 1972); Local 1288, Retail Clerks International Ass'n. v. N.L.R.B., 129 U.S.App.D.C. 92, 390 F.2d 858 (1968). In the Meat and Highway Drivers case, the court found that the work claimed was of the type that the men in the bargaining unit had the skills and experience to do, and reasoned, 335 F.2d at 714:
It would be difficult to deny that "[a] clause covering non-traditional work may be just as consecrated to the primary objective of bettering the lot of *215 the bargaining unit employees and just as foreign to the congressional purpose for section 8(e) as those clauses involving only the work traditionally done within the bargaining unit." [citation omitted].
The court also found that the work sought was not work acquisition but work recapture. The respondents thus claim that the work involved herein is fairly claimable as recaptured work within the Meat and Highway Drivers decision.
The Board claims that the Rules in question, as they are applied against CEI, are not directed at, and do not accomplish, a permissible work preservation goal. It asserts that the Union's concern is to acquire work which, until respondents' application of the claimed unlawful pressures, was being performed by non-longshoremen working on CEI's premises, and that such work had been historically thus performed for CEI. The Board charges that the Rules, as applied to CEI, require employer-members of NYSA to cease doing business with CEI or face payment of heavy liquidated damages, for the improper purpose of enlarging the Union's work jurisdiction.
The Board relies heavily upon the NLRB decision in International Longshoremen's Ass'n (U.S. Naval Supply Center), 195 N.L.R.B. No. 41, 79 L.R.R. M. 1289 (1972).[8] There, the Board found that the instant Union and several of its affiliates had violated § 8(b)(4)(ii)(B) by the pressures they applied to certain steamship lines and stevedoring companies who were members of the Hampton Roads Maritime Association, which, in turn, had a collective bargaining agreement with the Union and its Local 1248. This agreement contained Rules on Containers very similar if not identical to those between CONASA and the respondent Union.[9]
In its analysis of the charges the Board stated (79 L.R.R.M. at 1290):
The single question is whether the employer-members of the Association against whom Respondents directed their conduct are primary or secondary employers in the disputes over the handling of break-bulk cargo and stuffing of containers at the Supply Center. If the former, Respondents' conduct is lawful; if the latter, it is clearly unlawful.
At the outset it should be noted that this is not a case like National Woodwork, where the union's sole objective was the protection of traditional unit work of union members from diminution as the result of changes in technology. ILA members had never handled, so far as appears, either break-bulk or container cargo at the Supply Center. Whatever the charter jurisdiction of the ILA, it had not in practice been extended to the Supply Center. This is therefore a case of a "union seeking to restrict by contract or boycott an employer . . . for the purpose of acquiring for its members work that had not previously been theirs." We hold that under these circumstances members of the Association are neutral employers and the pressure exerted on them is for an objective prohibited by Section 8(b)(4)(B) of the Act. [footnotes omitted].
In distinguishing the finding in the ICTC case that the container Rules had valid work preservation objectives, the Board noted that these Rules could not legally be applied for improper work acquisition objectives:
The fact that the restrictive provisions in the ILA-Association collective-bargaining *216 contract, upon which Respondents rely may in other circumstances have valid work preservation objectives, [footnote omitted citing the ICTC case] does not mean that they can be used as a shield for conduct aimed not at work preservation but at acquisition of work historically performed by employees in another work unit. Id.

In opposition to respondents' claims that the work herein involved is fairly claimable by the ILA, the Board relies upon Teamsters, Local 282 (D. Fortunato, Inc.), 197 N.L.R.B. No. 124, 80 L.R. R.M. 1632 (1972). In the Fortunato case the NLRB rejected an assertion that work was fairly claimable by a unit when the work was similar to and required like skills as the work the unit presently and traditionally performed; it found that the clause in question sought to protect work historically performed by employees in other work units and therefore sought to achieve impermissible work acquisition objectives.
Thus it is the Board's position in the case at bar that containers that had been stuffed and stripped by Teamsters on CEI's premises were not historically restripped and restuffed at the docks by Longshoremen. The Board thus claims that the complained of activity is secondary, without "work preservation" justification, and proscribed by the charged sections of the Act.
Accordingly, it becomes apparent that the merits of this action will depend on the facts adduced before the Labor Board, and the Board's application of the legal theories here raised to those facts. Before I review the testimony that has been presented to me upon this preliminary application, it is appropriate to comment on the function of the district court in a proceeding of this nature.
The district court is cast in a restrained and limited role in a § 10(l) proceeding. Its task is not to determine whether the charged violations have occurred not is it finally to adjudicate and resolve the other disputed issues of fact and law. The court's sole functions are to determine whether the Board had reasonable cause to believe that the violations charged have been committed and, if so, whether the granting of equitable relief is "just and proper." Kaynard v. Independent Routemen's Ass'n., 479 F.2d 1070 (2d Cir. 1973). Schauffler v. Local 1291, International Longshoremen's Ass'n., 292 F.2d 182 (3d Cir. 1961) and more recently, Samoff v. Building & Construction Trades Council of Philadelphia & Vicinity, 475 F.2d 203 (3d Cir.), pet. for cert. filed, 42 U.S.L.W. 3090 (U. S. June 25, 1973) (No. 73-6), establish the guidelines this Court must follow in ruling on the Board's application:
The Board need not show that an unfair labor practice has been committed, but need only demonstrate that there is reasonable cause to believe that the elements of an unfair labor practice are present. Nor need the Board conclusively show the validity of the propositions of law underlying its charge; it is required to demonstrate merely that the propositions of law which it has applied to the charge are substantial and not frivolous. Schauffler, supra, 292 F.2d at 187; Samoff, supra, 475 F.2d at 206.
See also Boire v. International Bhd. of Teamsters, 479 F.2d 778, 792 (5th Cir. 1973); Hoffman v. Cement Masons Union Local 337, 468 F.2d 1187, 1193 (9th Cir. 1972), cert. denied, 411 U.S. 986, 93 S.Ct. 2269, 36 L.Ed.2d 964 (1973). Thus it is this Court's responsibility to grant the Board's application if it finds the Board's legal theory to be "substantial and not frivolous", even if it ultimately could not agree with that theory. In Samoff, a district court's denial of a § 10(l) injunction was reversed because it had concluded that although the Board's legal theories advanced were thoughtfully presented and not frivolous, they were in the court's opinion erroneous. 475 F.2d at 207. The rationale behind this decision is that if the court were actually to determine the applicable facts and legal issues it would *217 not have the benefit of the Board's opinion on questions of fact and novel questions of labor law when making its decision. Thus, the court would, to some extent, usurp the Board's function as the primary fact finder in cases arising under the Act and its function as primary interpreter of the statutory scheme. Schauffler, supra, 292 F.2d at 187-88; Samoff, supra, 475 F.2d at 207.
The wisdom in thus according a limited role to the district court is apparent in this matter. The containerization issue is a long standing one. The testimony is often in conflict on this highly complex question. Many facts, including ultimate facts, are bitterly disputed, and, even as to facts not in dispute, the parties are in disagreement as to the inferences to be drawn therefrom. If this matter does not involve novel questions of labor law, it certainly involves a novel application of established principles. The Labor Board should, and under the statutory scheme must, be the first to decide these questions. For the reasons hereinafter stated, I cannot conclude that the Board's legal theory is insubstantial and frivolous. Applying its legal theory, as expounded in the petition herein, and at the hearing before me, to the facts adduced, I find the Board had reasonable cause to believe that the charged violations did occur. I likewise find equitable relief to be "just and proper."
A detailed recital of the evidence is required for an understanding of the issues before this Court.
The testimony herein consumed 7 trial days, and occupied almost 1200 pages of transcript, consisting of the testimony of 9 witnesses and the introduction of much documentary evidence. The direct case of the Board consisted of documentary evidence and the testimony of Mr. Roy M. Jacobs, executive vice-president and chief operating officer for CEI in the United States. Jacobs is also co-owner of CEI, along with Mr. Rodolfo Catinchi, who runs the Puerto Rico end of the business. He testified that prior to February 1973 his containers, after delivery to the shippers, were invariably loaded upon ships without being stripped and stuffed on the docks by ILA labor, with the exception of a few specified isolated instances. He gave several reasons for the basis of his knowledge. The first reason involved the physical impossibility of stripping and stuffing a packed container and having it all fit back in the same size container without an overflow. Some of his shipments contain as many as 500 to 1000 pieces. The original stuffing at the Maspeth facility completely fills "every nook and cranny" of a container (Tr. 85). If the contents were removed, it would be impossible to replace it in the same size container, whether the same container or another, without an overflow because of the multitudinous number of pieces and the alteration of cargo dimensions when cargo is placed upon other cargo. In that event, the freight could not be shipped entirely in one container and this fact would come to his attention.
An additional reason relates to the time it takes for the stripping and stuffing to occur. Jacobs, who testified that his responsibility includes supervising his loading dock, estimated that it takes approximately 10-12 manhours to strip a container, and another 10-12 manhours to reload a container. He also testified that if more than four or five men were assigned to the task of stripping and stuffing a particular container, they would fall over each other and could not perform the operation efficiently. He stated that it was his practice to deliver containers to the pier on sailing days almost right up to sailing time, which would not provide sufficient time for stuffing and stripping on the dock before the ship sailed. If the container did not make a particular sailing, that fact would come to his attention.
Moreover, metal seals, purchased and owned by CEI, were placed upon the shipper-supplied containers when the stuffing on CEI's premises was completed. The seal was checked by his employees *218 in the normal course when it was placed on the container, when the CEI tractor driver would pick up the container from the San Juan pier, and when it was received at CEI's facility in Puerto Rico. If the seal was still intact the contents of containers could not have been rehandled. If a seal was broken, Jacobs stated he found out personally as the shippers' liability per carton within that container increased as much as 100 times.
Jacobs also testified to two indications resulting from the sequence in which the contents of CEI's trailers are loaded. Some trailers would be loaded sequentially in inverse order to the order of delivery. If the contents are stripped and loaded directly into another trailer, the order will be reversed. Moreover, certain sizeable shipments (10,000 lbs), known as header loads, are loaded first into the nose of the trailer. If trailers are stripped and the contents directly loaded into another trailer, these header loads would be split between the reloaded trailer and overflow.
Jacobs further testified to the lack of facilities, at least on the part of some of the carriers, to perform the stuffing and stripping of CEI's containers at dockside in the pre-1973 period. He stated he liked to divide his business among the three carriers in the Puerto Rico tradeSea-Land, TTT, and Seatrainalthough he later clarified that instead of one-third of his business going to each, the figures more closely approximated 40%-40%-20% or 45%-40%-15% respectively among these carriers. He testified that previously Seatrain did not have facilities to strip and stuff an LTL trailer at dockside, and thus it was impossible for this work to be performed. He also said that although TTT has some facilities for LTL freight, the facilities were minimal, were occupied with the LTL cargo that was solicited by TTT itself, and were not available for the stuffing and stripping of consolidators' freight. It was conceded that Sea-Land had sufficient facilities to perform the rehandling operation.
This testimony concerning the lack of facilities at Seatrain was confirmed by Mr. Arthur C. Novacek, presently executive vice-president of Seatrain Lines, Container Division, and formerly president of the division running the Atlantic portion of the Container Division. Novacek testified that prior to March 1973 his company had no dockside facilities for stuffing and stripping, and consequently CEI's containers (or any other consolidators') arriving at their Weehawken docks were loaded on ships without stuffing and stripping. Prior to that time, they had a non-waterfront facility at Secaucus from which they solicited their own LTL cargo. In March 1973 they abandoned this facility and moved to shed 154, Port Newark, where dockside stuffing and stripping could be performed.
Jacobs related two instances where he became aware of stuffing and stripping of his containers before February 1973. The first instance was in either 1966 or 1967. He received a telephone call from someone at Sea-Land who informed him that it was stuffing and stripping his containers. The rehandling then spread to Seatrain also. TTT was not in business at the time, or if it was it had only minimal service. The rehandling lasted about three weeks and stopped as suddenly as it began. The second instance was in 1971. It involved only Sea-Land, affected about 20 to 25 containers of the 1200 moved by CEI that year, and occurred intermittently over a period of months around the time that the ILA contract was up for renewal. On different occasions Jacobs spoke with two named officials at Sea-Land, and was advised on the first occasion not to worry because "it [would] blow over shortly," (Tr. 101), and, on the second occasion, that it would continue only for approximately another week as a contract was almost reached. Jacobs could not recall any other instances of stuffing and stripping for the years 1968 through 1972. On cross examination he indicated *219 that he had become aware of the Rules on Containers at the end of 1968 when he was informed of the adoption of these Rules by named officials at the three carriers, but that he was also told not to worry about the Rules as his containers would go through unimpeded.
He then testified to the change in practice occurring after February 1973 with respect to carrier stuffing and stripping of his containers. In late January or early February 1973 he spoke with officials of the three carriers and was informed of the Dublin meeting and the Rules there promulgated to put teeth into the stuffing and stripping provisions first embodied in the 1968 contract and later in the 1971 contract. On February 5, Sea-Land began stripping, with Seatrain following one week later on a more sporadic basis, and TTT not stripping until the end of February-beginning of March 1973.
At the onset of the February 5, stuffing and stripping, Jacobs spoke with a representative of Sea-Land who indicated that although there was no way to get around the rehandling, he thought it would blow over as it had a few years back. A later conversation, around February 22, indicated that this representative was not as confident that the rehandling in fact would blow over, and that the company was considering filing tariffs with the Federal Maritime Commission to pass on the cost of the stuffing and stripping to their customers. By this time Jacobs' containers were backed up at Sea-Land about two weeks.
Conversations with a representative of Seatrain indicated its attitude to be similar to that of Sea-Land. Initially, when Jacobs was notified of the so-called Dublin Rules in early February a representative of Seatrain indicated he was not at that time concerned about the effect of the new Rules. However, by late February the representative thought the rehandling would continue.
TTT, however, appeared to be more accommodating. Initially, upon the passage of the Dublin Rules, a representative stated it would continue to ship out Jacobs' trailers without stuffing and stripping. When the stuffing and stripping finally did begin, it was on a sporadic basis.
Thus by the middle of March 1973 Jacobs was routing most of his trailers through Seatrain and TTT, since Sea-Land was stripping and stuffing almost 100%. He was still backed up about 10 days at Sea-Land, waiting for his trailers to be rehandled; was delayed 3 or 4 days at Seatrain; and at TTT, about 8 trailers would go through without rehandling while 2 would be held for the next sailing to be rehandled.
On or about March 15, 1973, Sea-Land stopped supplying empty containers to CEI and also filed with the Federal Maritime Commission a tariff to permit it to pass on to its customers the $1,000 per container fine it had been required to pay pursuant to the ILA contract for containers not stripped and stuffed. Seatrain stopped supplying containers on March 25, 1973, while TTT continued supplying this equipment.
Jacobs then testified to a conference he had on April 3, 1973, with Mr. Michael McEvoy, chairman of the board of the parent corporation of Sea-Land. McEvoy stated that the preceding week his company had paid between $50,000 and $60,000 in liquidated damages for the containers handled for CEI prior to March 15, 1973. They discussed the tariff filing, in which this cost was attempted to be passed on. In responding to Jacobs' statement that the tariff, if effective, would put CEI out of business and the Jacobs planned to fight it, McEvoy stated he was aware of that fact but that there was no choice in the matter, and that he would rather face Jacobs in court in two or three years rather than face an imminent shutdown by the ILA. McEvoy did state, however, that he desired CEI's business, wanted it to continue in business, and would do what he could to keep it in business. A meeting was held the following day *220 where different alternatives were discussed without success.
A subsequent meeting was held the last week of April after the Federal Maritime Commission had suspended the tariff pages of Sea-Land. Jacobs initiated the meeting to ascertain how Sea-Land could continue to withhold containers in view of the FMC decision. McEvoy stated, according to the witness, that it was something they had to do, that "in effect it was them or us." (Tr. 144).
That same week a meeting was held with Mr. Peter Holzer, president of TTT. He stated that he would continue to supply containers, subject to some stripping and stuffing, although he could not make available containers with the TTT name on them. Instead, foreign trailers, those acquired from railroad pools, were supplied. These foreign containers differed in that they had wheels attached. TTT could handle these as they had a roll-on roll-off type of operation for loading their ships. Seatrain and Sea-Land apparently could not handle foreign boxes as they loaded in a lift-on lift-off type operation.
Additional conversations were held by Jacobs with representatives of Seatrain and TTT in which means to accommodate CEI's business while meeting contractual obligations were discussed. Nothing developed from these conversations, though all three shippers indicated CEI was a desirable customer and attempted to work out ways to keep it in business and continue with it. Jacobs indicated he was a substantial account of each of the shippers.
The witness further testified that, at present, he was not receiving containers from Sea-Land and Seatrain, and thus was shipping only through TTT. He also indicated that he was economically harmed if all supplied him containers but continued to strip and stuff. He could not solicit cargo with a known delivery schedule; and he has been hurt by the increased damage to cargo resulting from simple rehandling, and the loss due to overflow damage. His customers are withholding payment of freight bills because complete cargos are not delivered. He has had additional expense in having his men in Puerto Rico pick up overflow cargo. He concluded that he could not remain in business if the three carriers were to strip and stuff on a permanent basis. For the above reasons, and since even TTT was stuffing and stripping, he could not continue indefinitely with them. The proposals he discussed with the carriers to keep him in business were only as stopgap measures in the hope that the stopping of stuffing and stripping could be negotiated by the carriers with the ILA.
Jacobs testified that although he did not have a profit every year, his company showed a steady growth pattern in volume since its incorporation in 1965 of from approximately three quarters of a million dollars to over three million dollars. Financial statements were introduced for this period and indicated the reduction in business since February 1973. The witness introduced a notice of April 13, 1973, from the NYSA-ILA Contract Board. This notice, circulated to all carriers, listed 14 companies whose business resulted in the carriers being assessed fines for violations of the Rules on Containers. CEI was on that list.
Additionally Jacobs testified that about six weeks ago he lost his sales manager who had been with CEI for about three years, to Windward Marine, a NVOCC operating at an off-pier location within the fifty mile radius of the Port of New York, that began operations around the beginning of 1973. The manager left because of frustration in not being able to assure customers a delivery schedule.
In addition to his testimony concerning the lack of stuffing and stripping of his containers by the shippers before February 1973 and the reversal then occurring, Jacobs detailed the history of his company and its predecessor in dealing in consolidated freight that required stuffing by non-ILA labor at his facility. The predecessor to CEI, Valencia-Baxt[10] *221 came into existence in 1949. In 1953, when Jacobs joined that corporation, eight-foot containers were used. They were at that time shipped on two lines, Bull Insular Line and Alcoa, the present carriers not yet being in existence. It was testified that the process then performed was in no way different from the stuffing of the 35 and 40 foot containers currently used; it was still a consolidation of LTL cargo although the number of different shippers per container of course was smaller. In 1955 the Bull Line started using 20-foot containers which greatly increased the number of different shippers per container. These were handled by Valencia-Baxt in a similar manner and were the forerunners to the present size containers.
The respondents' case consisted of the testimony of various witnesses as to the traditional work jurisdiction of longshoremen, the history of the collective bagaining negotiations between the NYSA and the ILA over the issue of containerization, and the practices of certain shippers with respect to the stripping of CEI's containers.
The NYSA's first witness was James J. Dickman, president of NYSA since 1971 and also president of CONASA. He began in the industry in 1939 and since that time has worked every section of the Port. He testified to the work traditionally performed at the docks by longshoremen, and to the history of the NYSA-ILA negotiations on containerization.
He stated that the jurisdiction of longshoremen encompassed all work performed from the ship to the tailgate of the truck. At the time eight foot containers were used, ILA labor put cargo into and received cargo from these boxes. He testified that in 1958 containerization became a problem, at least with respect to one shipper, U.S. Lines. At this time they were using 20 foot containers. The witness testified that the containers were always stuffed and stripped by longshoremen at the pier.
He then discussed in detail the history of the negotiations between NYSA and ILA in which he claimed to have personally participated. He stated that the 1959 contract was the first agreement between the ILA and NYSA on the containerization issue. As a result of this agreement, he stated, the NYSA recognized the rights of longshoremen to load and strip LTL and consolidated cargo. However, disagreement, accompanied by many strikes and industrial unrest, continued, so that at the beginning of the 1968 negotiations the NYSA insisted that all containers move freely through the Port while the ILA insisted on stuffing and stripping all containers. A compromise was reached which was described as permitting the free flow of 80% of the containers through the Port in exchange for an increase in the guaranteed annual income for longshoremen to 2080 hours per year. The remaining 20% of the containers that were to be stuffed and stripped consisted of all LTL or consolidated freight sent from off-pier locations within 50 miles of the Port of New York. He stated that Rules were promulgated defining stuffing and stripping, and detailing the agreement on containerization; these rules were readopted and exist in the present contract virtually unchanged, with the exception of an increased liquidated damages provision from $250 per container to $1000 per container.
He then testified to the machinery set up to enforce these Rules, and the difficulties had in enforcing compliance. These difficulties culminated in the January 25-29, 1973, meeting in Dublin, Ireland and the Rules resulting therefrom. Subsequently, enforcement attempts resulted in the assessment of over $330,000 in liquidated damages. The assessments against the three carriers here involved were as follows: Sea-Land$102,000, first $63,000 and then an additional $39,000; Seatrain $107,000; TTT$21,000.
*222 The witness concluded that containerization has resulted in a decrease in the number of longshoremen, with an increase in the NYSA's costs in maintaining these fewer employees in terms of the guaranteed annual wage resulting from contractual arrangements on containerization. While the productivity of the Port as a result of containerization has greatly increased, the number of longshoremen has decreased from 31,500 in 1958 to 13,700 at present, with a decrease in the number of manhours from 43 million to 24½ million over the same period.
On cross examination, however, the witness cast doubt on the validity of his previous testimony on the meaning of the 1959 agreement and the tradition represented in the agreements up to 1968. He conceded that the language of the 1959 and 1962 agreements did not expressly provide for any stuffing or stripping. The language of sections 8A and 8C of the 1959 agreement was quoted:
Section 8A: Any employer shall have the right to use any and all type of containers without restriction on stripping by the union.
8C says: Any work performed in connection with the loading and discharging of containers for employer members of the NYSA which is performed in the port of greater New York, whether on piers or terminals controlled by them, or whether through direct contracting out, shall be performed by ILA labor at longshore rates. (Tr. 468)
The witness conceded that the terms "stripping," "stuffing," "loading" and "discharging" are terms of art with specific meanings and that those terms were actually defined in the 1968 agreement.[11] The fact that this agreement did not contain any requirement of stuffing and stripping, in the opinion of the NYSA, was supported by its position taken in the 1968 negotiations. The NYSA's position statement indicated that the Union accepted the containerization concept in 1959, but that because of the labor difficulties that had arisen the employers would be willing to make an exception "to the present contractual rights of the employers to use any and all types of containers without restriction by the union." (Tr. 483). The witness then explained that he was not a member of the negotiating committee in 1959, and regardless of the words of the agreement there existed stuffing and stripping restrictions in practice at the docks from 1959. On redirect, he stated that the word "discharge" in addition to taking cargo from a ship, also meant removing cargo from a container. He reasoned that this is probably what was meant as he knew what had to be done at the docks.
The NYSA then called Boleslaw Szolkowski, vice-president in charge of operations for TTT, who had been with the company since it started operations in 1967. He testified to the past practices of TTT with respect to stuffing and stripping.
He stated that his company's invariable practice, upon receipt of consolidated and LTL trailers, was to send them to the stuffing and stripping shed, where the seal was then broken and the trailers stripped and stuffed before they were loaded on board ship. He brought with him a series of 107 documents consisting of a dock receipt and a so-called "tally sheet" for each container shipped by TTT for the months of October through December 1972. The dock receipt showed the CEI seal number on the container when received by TTT. The tally sheet, referred to as proof that the container was stripped, contained the initial seal number, a new seal number put on by TTT, and a signed statement indicating that the cargo had been "unloaded and loaded into the same unit."
On cross examination, several facts were developed that could lead to the inference that the stripping and stuffing indicated on the tally sheets might not *223 in fact conform to what in actuality was occurring. The witness stated that he was testifying as to the stuffing and stripping solely on the basis of the signature on the tally sheet. He had no personal knowledge of whether the stripping was being performed on CEI and had never observed a complete stuffing and stripping cycle. A specific dock receipt was shown to the witness where a CEI shipment was received by TTT approximately one hour before sailing time. When asked how this trailer could be stuffed and stripped, the witness stated that if it took 18 man-hours to strip and stuff a container, it could be rehandled in one hour by assigning 18 men. He did concede that 18 men would fall over each other and that this might even be dangerous to have this number of men working, but he still claimed it could be done in the hour, although it would not be economical.
Additionally, he stated that documents for the months of October-December 1972 indicated that in those three months there was not a single container in which there was an overage, i.e., where there would be left over cargo when the contents of a container were attempted to be repacked into that same container. Furthermore, he indicated that in March 1973, when they were stuffing and stripping pursuant to the Dublin rules and were required to place the contents in a second container, he found that 4 out of every 10 containers had overages. When asked to explain the lack of coverage for October-December, he stated that it was easier to repack cargo in the same container than to pack it in another container of the same size because of the order of repacking and that some cargo would be reversed from top to bottom. He later conceded that he had no personal knowledge that this was so, but said that someone had told him of this difference. Moreover, the witness' understanding of the ease of repacking a consolidated container was apparently not held by his company's past president. Mr. Jacobs testified on redirect that, in a proceeding before the Federal Maritime Commission in June 1973, he heard Mr. Nick Carter, president of TTT until April 4, 1973, state that it was exceedingly difficult to unload a NVOCC consolidated container and stuff the cargo from that container into a container of the same size, whether it was the same container or another because of the expertise of those who originally stuffed the container in filling all available space.
Furthermore, the witness testified that in October 1972 there was a change in record keeping since the ILA was complaining to the NYSA of violations in the Rules on Containers. He stated that at this point his company started attaching the tally sheets to the dock receipts, while previously the tally sheets had been kept separately. It was the position of the charging party that the record change at this point was far more substantive. Dock receipts were offered for a period in September 1972 along with the trailer interchange receipts (TIR) for those dock receipts. The TIRs are prepared in Puerto Rico at the receiving end of the shipment and record the seal numbers on both the dock receipts and TIRs causing the witness to conclude that these trailers had not been stripped.
Subsequently introduced were dock receipts, tally sheets, and TIRs for the month of May 1972. Although the tally sheets contained a signature attesting to the fact that the trailers were stripped, along with a five digit TTT seal number, the TIRs contained only the 4-digit CEI seal number that corresponded to the seal number on the dock receipts.
The NYSA also presented Mr. Michael Nicholas of Sea-Land, whose testimony was similar to that of Mr. Szolkowski. Nicholas, with Sea-Land since 1963, is manager of Elizabeth cargo operations and is responsible for Sea-Land's pier operations in Elizabeth. He described the procedures invariably followed by his company regarding stuffing and stripping consolidated containers. Prior to January 1, 1973, containers were sent to the stuffing and stripping sheds and *224 reloaded into the same container. Presently containers are not supplied to consolidators, but to those who have containers, the cargo is replaced into a second container after stripping. Both before and after January 1, 1973, when stuffing and stripping was completed Sea-Land placed its own 6-digit seal on the container and recorded this seal number on a document called the container manifest, which also records the seal number originally on the container. Introduced into evidence were documents pertaining to the shipment of 113 CEI containers comprising CEI's shipments through Sea-Land for the months of October, November, and December 1972. A complete set of documents for each container consisted of the bill of lading, showing the original seal number; the container manifest, showing the original and new seal numbers; and the TIR, showing the seal number recorded in Puerto Rico when the containers arrived. The TIR usually showed the 6-digit Sea-Land seal number. The witness indicated that 4 of the containers did not show seal numbers, illustrating that of the 113 containers, 4 must have slipped through unstripped and stuffed.
On cross examination Nicholas also indicated that he had no personal knowledge that CEI's containers were stripped and stuffed other than from the changed seal numbers appearing on the documents. He stated he was not responsible for the checkers, that it was the checkers who made the decision which containers were to be stripped, and that his men at the stripping shed stripped only those containers sent to them by the checkers.
Moreover, during the period represented by the documents introduced in evidence, Nicholas stated he was not made aware of any overages resulting from the stripping, and that such difficulties would come to his attention. He attributed the absence of overages to the expertise and experience of his men in performing the rehandling operation. He stated that usually up to four longshoremen perform the stuffing and stripping, but that more men could be assigned if necessary.
With respect to the witness' knowledge of why he was stuffing and stripping, the testimony indicated that in 1966, when the witness first became responsible for the rehandling operation, he did not know that stuffing and stripping was part of the labor agreement. He understood, however, that container Rules were put in the 1968 agreement.
In summary, this witness' assurance that CEI's containers were stripped and stuffed was based on the seal changes indicated on the documents. CEI's position was that these seal changes did not necessarily indicate that the rehandling was performed. It was claimed that a second seal could be placed upon a container without opening the doors to that container and breaking the first. It would then be a simple matter to have the carrier's employee who completed the TIR to record only his company's seal. The fact that a second seal could be placed on a container without affecting the first was testified to on redirect by Mr. Jacobs. This premise is not altogether unreasonable in view of the $1,000 fine per unstripped container faced by the company if their records could not show that the rehandling operation is performed. Moreover, it was also in the company's interest to have its customer's freight move unimpeded. The supposition of the charging party would permit the company to satisfy both of these competing interests.
The NYSA also called from its ranks John A. Haynes, its administrative director since 1968. He had been with the NYSA since 1958, and before then, with a shipping line, in various positions since 1944. His testimony concerned itself with those areas covered by Mr. Dickman, also of NYSA. He testified to the practice on the docks of having longshoremen load cargo in and out of boxes from the time these boxes were first used. Certain containers were stuffed off the piers, but these were the so-called "shippers label" containers, which *225 were entirely filled by a single manufacturer.
Haynes also testified to the history of the labor relations between the NYSA and ILA over the container issue, beginning from 1958. At that time, he was special assistant to the chairman of the NYSA's labor policy committee and took part in the negotiations leading to the 1959 agreement. A significant portion of his direct and cross examination focused on the meaning of the 1959 agreement and its clauses 8A and 8C. (See page 222 supra). He testified that those who were in the industry understood the terms of these sections to recognize the right of the Union to stuff and strip containers, regardless of the difficulties one not in the industry might have in gleaning this interpretation from these laymen-drafted clauses. He also testified that these clauses differentiated shippers label cargo from consolidated or LTL cargo, recognizing the Union's right to strip and stuff only the latter.
The NYSA concluded its case with the testimony of Michael R. McEvoy, chairman of the board and chief executive officer of Sea-Land. He has held his current position for three years, since 1961 had been president, and had been with the company since 1956. He became involved with collective bargaining with the ILA in 1961, and testified that at that time he knew that under the provisions of the then existing collective bargaining agreement he was required to stuff and strip LTL and consolidated containers. After going through the history of the labor relations from that time to the present, he stated that it has been the fixed policy of Sea-Land, from 1961-1972, to have containers containing LTL and consolidated cargo stripped and stuffed by deepsea ILA labor at Sea-Land's terminals.
The ILA called Mr. Thomas W. Gleason, its international president since 1963, and in the industry since 1915. He testified to the history of the containerization dispute. He indicated that regular container service to Puerto Rico began in 1958 by the Pan-Atlantic Line which later became Sea-Land. At that time it was understood that the existing customs and practices would remain in effect and that the ILA would "load and discharge" all containers at the piers. He did state, however, that the ILA agreed to permit shippers or manufacturers label containers to go through without interference. He explained the terms of the 1959 agreement to conform with this practice. He stated that the employer's rights recognized in section 8A of the 1959 agreement applied only to the manufacturers or shippers loads. Section 8C, he claimed, was the protection for the Union to preserve their traditional work. By the time that the 1968 agreement was being negotiated, the nine years of controversy over containerization caused Gleason to insist on written rules to be placed into the contract so that customs and practices would not have to be relied upon to settle container disputes. Also presented was the testimony of Michael Raiola, a shop steward, since 1946, and longshoreman since 1933. He testified that prior to 1959, when he worked for the Bull Line, 90% of the containers used were "loaded or stripped" by longshoremen at the pier. The exempt 10% consisted of the U.S. Mail and household goods of persons relocating.
In summary, an overview of the testimony reveals that the major factual disputes relate to the tradition of stuffing and stripping. The Board contends that traditionally the employees of CEI have stuffed consolidated and LTL freight at CEI's premises and that these containers have traditionally been shipped without rehandling at the pier by ILA labor until the beginning of 1973. The respondents, on the other hand, contend that the ILA has traditionally stripped and stuffed consolidated and LTL loads at the pier, and specificially claim to have uniformly performed this rehandling operation on CEI's containers. It is not the function of this Court to ultimately resolve these sharp clashes of factual differences, or to make credibility determinations *226 that will bind the parties in subsequent proceedings. Schauffler v. Local 1921, International Longshoremen's Ass'n., 292 F.2d 182, 186 n.4 (3d Cir. 1961). This function must be performed by the Board. It is my responsibility, however, to determine whether the Regional Director has reasonable cause to believe that the charges here filed are true. Id.
Since the factual disputes detailed above could be resolved in favor of the charging party, if Jacobs is believed, I find that the Regional Director had reasonable cause to believe that CEI has traditionally had Teamster employees, whether direct employees, or through U. S. Trucking, who have performed the function of loading containers of LTL freight upon CEI's off-pier facilities; and that these activities continued during and from the time of Valencia-Baxt, the company I have found to have been CEI's direct predecessor. With respect to whether these containers have systematically been stuffed and stripped at the docks prior to 1973, although the evidence is conflicting I find that the Board had reasonable cause to believe the facts as alleged by the charging party, that the rehandling had not occurred. I make this finding notwithstanding the documentary evidence submitted to indicate the contrary, for I find that the Board could reasonably believe the documents insufficient, in light of the other testimony, to disprove CEI's contention that its containers were not physically opened and their contents rehandled.
Not necessarily inconsistent with the above finding is the respondents' contention that stuffing and stripping of consolidators' containers was historically performed at the piers. Whatever this tradition, however, the Board had reasonable cause to believe that it did not affect, in practice, CEI's containers. It is undisputed that in 1968 the container Rules became a part of the collective bargaining agreement between the NYSA and the ILA. There is a dispute over whether the recognized objective of these Rules was incorporated in the language of earlier agreements as far back as 1959. Although the Board contends that the Union's objective first surfaced in the language of the 1968 agreement, and that whenever it did appear it was not enforced, at least with respect to the charging party, until this year, its position is that when it did appear, it did not represent a tradition of work historically within the ILA jurisdiction, but an acquisition of work through Union strength after numerous strikes and work stoppages. On the other hand, the respondents contend that the tradition of the industry precedes the first representation of that practice in a collective bargaining agreement, which it claims to be the 1959 agreement. It is not necessary for me to even attempt to resolve these contentions, given my first finding, i.e., that the Board had reasonable cause to believe that CEI's containers had not been stripped and restuffed by ILA labor. Accepting arguendo, the position of the respondents with respect to tradition in the industry, I find then I am faced with two traditions, viz: the tradition of CEI performing the work of a consolidator on its premises and having its containers pass unhandled, and the tradition of the ILA stuffing and stripping consolidators' loads at the pier, but for whatever the reason, failing to rehandle the charging party's containers.
Given these facts, it is the Board's legal contention that the application of the Rules on Containers to obtain the stuffing and stripping of CEI's containers for ILA labor on the pier is unlawful work acquisition proscribed by the National Labor Relations Act. Based on the law as it now stands, and upon the cases relied upon by the petitioner, I conclude that this theory is substantial and not frivolous. The fact that this theory has not been tested in this particular factual context does not require a contrary determination. Boire v. International Bhd. of Teamsters, 479 *227 F.2d 778, 789 (5th Cir. 1973); Kennedy v. Los Angeles Typographical Union No. 174, 418 F.2d 6, 8 (9th Cir. 1969).
In view of this finding, I must next determine whether the issuance of a temporary injunction in this case is just and proper. On one side is a company, CEI, which I find, has suffered a decline in business as a result of the application against it of the Rules in question. There is testimony, which I credit and accept, that it cannot continue in business and will have to cease operations. A continuation of the respondents' practices complained of constitutes a threat of irreparable injury to the charging party.[12]
Respondents claim that enjoining the Rules on Containers will result in a loss of 2,000 waterfront jobs with irreparable injury to the fund supporting the guaranteed annual wage. A temporary injunction in this proceeding, however, will not have that effect, as its function here would be to effectuate congressional policy by calling a temporary halt to the charged unfair labor practices to enable the Board to make a determination on the charges. The injunction need only apply to the Rules as they affect the charging party. Its effect upon respondents, therefore, would be minimal. However, its effect upon the charging party would be to prevent it from being forced to cease operations as a result of the very acts which the Regional Director seeks to have the Board conclusively determine to be illegal. The public interest, therefore, as expressed in the policy underlying § 10(l), would be served by the issuance of the temporary injunction, and I accordingly find the remedy here sought to be "just and proper."
Accordingly, petitioner's application will be granted and the temporary injunction shall issue. Submit an appropriate order on 1-day notice.
NOTES
[1] Section 10(1) provides in pertinent part: Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 8(b), or section 8(e), or section 8(b)(7), the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any district court of the United States (including the District Court of the United States for the District of Columbia) within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: Provided further . . . Upon filing of any such petition the courts shall cause notice thereof to be served upon any person involved in the charge and such person, including the charging party, shall be given an opportunity to appear by counsel and present any relevant testimony: Provided further, That for the purposes of this subsection district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in promoting or protecting the interests of employee members. . . .
[2] Petitioner contends that CEI, as the legal successor to Valencia-Baxt, which had been established in 1949, took over the relevant aspects of an existing operation which had been in progress in substantially its present form since a much earlier time. By surrendering certain shares of stock they owned in Valencia-Baxt, the two principals of CEI took over the freight consolidating and forwarding business of Valencia-Baxt at its New York premises, and assumed certain liabilities of Valencia-Baxt, continuing to employ the same employees and supervisors. CEI also inherited the relationship with U. S. Trucking Co. and Local 807, Teamsters, described infra. For purposes of this proceeding it can be said, and is so determined by me, that the Board could find, within the "reasonable cause" formulation of § 10(l), CEI to be a de facto and de jure successor to Valencia-Baxt insofar as its marine cargo business is concerned.
[3] It is the position of respondents that the Union members had been regularly stripping and restuffing these prestuffed containers before they would load them on board ship. This is a major point of factual dispute between the parties and will be hereinafter discussed.
[4] CONASA is an association of those shipping associations located geographically from the Port of Boston down to Hampton Road, Virginia, established in about 1970 to afford the Union an opportunity to bargain on seven key issues on a master, rather than on a local association-wide basis. One of the master topics is the Rule on Containers. The various local shipping associations bargain with the Union on other matters not covered in the CONASA agreement.
[5] Although these Rules first appear in the 1968 agreement, the respondents contend that the practice represented by these Rules was manifested in earlier agreements. Whether it was or not is a disputed fact which the Board must resolve.
[6] The evil of a secondary boycott, as stated by Judge Learned Hand in International Brotherhood of Electrical Workers v. N. L. R. B., 181 F.2d 34, 37 (2d Cir. 1950), aff'd., 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951), is that

its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands.
[7] Accord, N. L. R. B. v. Local 164, International Brotherhood of Electrical Workers, 388 F.2d 105, 107-108 (3d Cir. 1968):

If protest activity by a Union against an employer is based solely on "proper" grounds, the secondary boycott provisions are inapplicable regardless of the severity of the impact on neutral employers. [citations omitted] However, if an object of such activity is one proscribed by the statute, the action will be condemned even though it might also have legitimate labor objectives. . . .
[8] For the decision of the district court granting a § 10(l) injunction, see Penello v. International Longshoremen's Ass'n., Local 1248 (U.S. Naval Supply Center), 78 L.R.R. M. 2009 (E.D.Va.), aff'd. as modified, 455 F.2d 942 (4th Cir. 1971).
[9] The Hampton Roads Maritime Association is now a member of CONASA, as is Respondent NYSA, and is bound by the current agreements.
[10] See note 2 supra.
[11] See page 209, supra for definitions.
[12] In view of this finding, I need not decide whether irreparable injury under general principles of equity must always be shown on a § 10(l) application, or whether Congress intended a lesser injury to be sufficient. See Danielson v. Local 275, Laborers International Union of North America, 479 F.2d 1033 (2d Cir. 1973).